**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Constance Haas MEESTER, Jeanne Sanfratello Tumulty, Robert Haas, Edward Conrad Sawyer, Defendants-Appellants.**

No. 83–8769.

United States Court of Appeals,
Eleventh Circuit.

May 20, 1985.

Rehearing and Rehearing En Banc
Denied July 9, 1985.

Clyde M. Taylor, Jr., Tallahassee, Fla., for Meester.

John M. Sims, Albion, Mich., for Tumulty.

N.C. Deday Larene, Detroit, Mich., for Haas.

Stephen Marc Slepin, Tallahassee, Fla., for Sawyer.

William P. Adams, Asst. U.S. Atty., Macon, Ga., for plaintiff-appellee.

Before RONEY and HENDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

ALBERT J. HENDERSON, Circuit Judge:

The appellants, Constance Haas Meester, Jeanne Sanfratello Tumulty, Robert Haas and Edward Conrad Sawyer, were charged in a multiple count indictment with various drug related offenses. The evidence adduced by the government at the trial established the existence of a loosely organized group of people engaged in the importation and possession of marijuana with the intent to distribute. The government primarily relied on the testimony of witnesses who were actual participants in the importation and possession scheme and who testified pursuant to plea bargains or in exchange for immunity from prosecution. Meester, Tumulty, Haas, Sawyer, and Herman Whitlow were tried before a jury in the United States District Court for the Middle District of Georgia. At the conclusion of the evidence, the district court granted a directed verdict in favor of Haas and Sawyer on one count. The jury thereafter convicted the appellants on all remaining counts. All five defendants filed notices of appeal. On September 25, 1984, Whitlow's appeal was dismissed as moot because of his death. We now affirm the convictions of Meester, Tumulty, Haas and Sawyer.

I. *Facts*

In the fall of 1979, George Kersting met with Judy Haas McNelis in Jamaica and agreed to try to fly a load of marijuana out of Jamaica. Kersting's first attempt, in conjunction with pilot Frank Corry, was unsuccessful due to mechanical problems with the plane. On November 16, 1979, Corry paid $92,268.00 in cash for a Piper Navajo airplane designated by the registration number N9044Y. The retail purchase order, signed by "J. McHenry," listed Aircraft Amalgamated Corporation, a Florida corporation formed by the appellant Sawyer, as the purchaser. Kersting and Corry made three flights to Jamaica for McNelis in the N9044Y aircraft. They returned to

Florida each time with approximately 1,250 pounds of marijuana. Following the third trip, Kersting traveled to Texas and remained there for several months.

In April, 1980, Kersting, accompanied by Garry Childers, returned to West Palm Beach, Florida, and moved into a house rented by McNelis in Boynton Beach, Florida. Kersting and Corry subsequently made two trips to Jamaica for McNelis in a Piper Navajo, registration number N9251Y, purchased by Corry on February 28, 1980 for $104,020.00 in cash. The purchase order, signed by "J. McHenry," listed Aircraft Amalgamated Corporation as the purchaser.

In mid-April, 1980, McNelis, Kersting and Childers traveled from south Florida to the residence of Robert Haas, McNelis's father, in Valdosta, Georgia. Subsequently, Haas paid $8,400.00 in cash for a trip to the Caribbean in a Lear Jet for the purpose of locating Corry, who was stranded on one of the islands. In addition, McNelis provided Childers with $5,980.00 cash to purchase a pickup truck with a camper shell for use in transporting marijuana. While in Valdosta, Childers saw Meester depart Haas's residence in a rental car with a trunk full of marijuana. McNelis and Kersting returned to Florida in McNelis's Cadillac. Childers followed in the pickup truck, which was loaded with approximately 200 pounds of marijuana. Upon their return to the house in Boynton Beach, the marijuana was transferred to Tumulty.

On April 29, 1980, McNelis purchased her own Piper Navajo airplane, registration number N72599, because Corry was no longer able to work McNelis's smuggling schedule around his airplanes. Corry purchased the plane for $113,380.00 with cash provided by McNelis. The purchase order was signed "Harrison Williams," vice president of United Equity Title Company, a Florida corporation organized by Sawyer.

In early May, 1980, McNelis, Kersting and Childers moved into a house in Gulfstream, Florida. During May, Kersting and Corry imported three 1,250 pound loads of marijuana from Jamaica to south Florida for McNelis in Piper Navajo N72599. Haas made arrangements for the transportation in Jamaica. On May 29, 1980, Palm Beach County, Florida Sheriff's deputies seized Piper Navajo N72599 at Palm Beach International Airport after observing the suspicious circumstances of its landing. Apparently at Corry's suggestion, McNelis asked Sawyer to obtain the release of the plane. On June 11, 1980, Sawyer signed an Indemnification and Hold Harmless Agreement in which he agreed to hold the Palm Beach County Sheriff's office harmless for acts surrounding the release of the aircraft. In the agreement, Sawyer represented that he held all the stock in United Equity Title Company, the registered owner of N72599.

In mid-June, 1980, McNelis traded Piper Navajo N72599 to an airplane dealer in Memphis, Tennessee in exchange for a Beechcraft Queenair, N5595L, and a Cessna 421, N2960Q. Sawyer registered the aircraft in Florida corporations he organized, namely, Queen Bee-ch, Incorporated and Violet's Aviation Corporation. According to Childers's testimony, McNelis wanted to register the planes in corporate names because they would be easier to retrieve if they were seized by the authorities.

McNelis and Kersting subsequently traveled to Jamaica to check on the price and quality of marijuana to be imported into the United States on the Queenair. Upon their return from Jamaica, McNelis was arrested coming through Customs. Childers testified that he picked up Kersting and they then contacted Sawyer to assist in securing her release. In July, 1980, Sawyer introduced McNelis, who was in the market for a pilot to replace Frank Corry, to Frank Marrs, an Eastern Airlines pilot on a medical furlough who was Sawyer's close friend. Marrs agreed to smuggle marijuana in the Queenair for $50,000.00 per trip and to maintain both the Queenair and the Cessna 421 at his private airstrip in Lake Placid, Florida.

In late July and early August, 1980, Marrs made modifications to the Queenair

to increase its range and stability for smuggling use. Arrangements were made to use an airport in Sylvester, Georgia for offloading purposes and Childers rented a house on Sherwood Drive in Valdosta, Georgia to store the marijuana. McNelis, Meester, Kersting and Childers subsequently met to make plans to bring a load of marijuana from Jamaica into Georgia. Meester traveled to Jamaica to arrange for the marijuana. Following preparations, Frank Marrs and Kersting flew the Queenair to Jamaica carrying $37,000.00 in cash. No Customs Form 4790, a report on the international transportation of currency, was filed with Customs agents. Upon landing in Jamaica, Kersting gave the money to Meester. Marrs and Kersting picked up a cargo of approximately 1,100 pounds of marijuana and flew it into the Sylvester, Georgia airport. Childers offloaded the marijuana and drove it to the Sherwood Drive address in Valdosta. McNelis and Tumulty, assisted by Childers, inspected and weighed the marijuana and sold it to two purchasers. On August 18, 1980, Meester paid $13,323.22 cash for a new Datsun 280ZX automobile.

Approximately a month after the August importation, Haas and Meester traveled to Jamaica to formulate a deal for a second load of marijuana. On October 5, 1980, Marrs and Kersting flew the Queenair to Jamaica. Kersting carried $56,000.00 in cash obtained from McNelis, again without filing a Form 4790. When they arrived in Jamaica, Kersting gave the money to Haas and then proceeded to load 1,350 pounds of marijuana on the plane. Marrs and Kersting returned to Sylvester, Georgia, where Childers and Dennis Dabbs offloaded the marijuana and took it to the house on Sherwood Drive in Valdosta. Tumulty subsequently secured a purchaser from Michigan by the name of Ron Joslin for this second cargo. Joslin arrived in Valdosta with approximately $70,000.00 in cash.

McNelis gave Kersting $37,000.00 of the cash obtained from Joslin to purchase a third load of marijuana. On October 10, 1980, Marrs and Kersting again flew the Queenair to Jamaica. No Form 4790 was

filed for the currency. Upon landing, Kersting gave the money to a Jamaican for delivery to Haas. Kersting and Marrs then transported 1,350 pounds of marijuana to the Sylvester airport. Childers and Dennis Dabbs offloaded the marijuana and took it to a second stash house in Valdosta. Joslin again purchased most of the third load of marijuana, some of it on credit.

Around October 23, 1980, McNelis, Kersting and Marrs traveled to Michigan to check on the marijuana purchased by Joslin on credit. While in Michigan, McNelis sought Sawyer's advice on how to collect the money, but declined to use the person he recommended because of the 50% collection fee. Tumulty, who had accompanied Joslin on his return to Michigan, received several payments from Joslin. Kersting took $90,000.00 of the cash and departed company with McNelis. Joslin subsequently returned the marijuana he was unable to sell to Childers who drove it to South Carolina at the direction of McNelis.

Shortly before Thanksgiving in November, 1980, Haas and Childers traveled to Jamaica for the purpose of setting up the fourth importation. Childers carried $20,-000.00 in cash, given to him at the Miami Airport by Haas, for which no Form 4790 had been filed. Haas remained in Jamaica to make preparations and Childers returned to the United States. After receiving $65,-000.00 in cash from McNelis, Marrs and another pilot flew the Queenair to Jamaica where they received 1,650 pounds of marijuana. Upon their return to Sylvester, Childers and Dabbs took the marijuana to a third stash house in Valdosta. Meester and Doug Meester, her boyfriend at the time, went to the stash house where McNelis requested Doug Meester's assistance in selling the marijuana. When she was unable to sell the marijuana, McNelis moved it to another house near Valdosta where she stored it until early January, 1981.

In December, 1980, Frank Marrs made several trips to Valdosta for the purpose of collecting approximately $112,000.00 owed

him for his services. On his last visit, he left a black Toronado automobile at McNelis's residence. Shortly after Christmas, 1980, Ed Sawyer also traveled to Valdosta where he met with McNelis to discuss money owed to him by McNelis. McNelis gave Sawyer some marijuana and he departed in the Toronado.

McNelis and Childers met with Tumulty and John Parrella at Tumulty's residence in south Florida in late December, 1980 where they discussed the money owed to Marrs and the fact that he was holding the Queenair because of the dispute over the debt. McNelis and Childers met with Marrs the following day in an effort to resolve the controversy. Marrs told McNelis that he would fly for her or return the airplane after he was paid. Later that day, at the direction of McNelis and Tumulty, Childers and John Parrella drove Marrs to a rural area in Palm Beach County, Florida where Parrella shot and killed Marrs.

In January, 1981, McNelis transported the last load of marijuana from Valdosta to Michigan and then to the area around Boulder, Colorado. Childers and Tumulty went to Boulder where they met with McNelis. Tumulty informed McNelis that some buyers were coming to look at the marijuana. McNelis subsequently returned to Georgia while Haas traveled to Colorado to attempt to locate purchasers. During the period from January, 1981 to July, 1981, McNelis and Haas both requested the assistance of Gary Scott in selling the marijuana in Boulder. Scott's efforts were largely unsuccessful so Haas retrieved the marijuana. Sometime in August, 1981, Haas contacted Scott with a complaint that some of the marijuana was missing and he and McNelis went to Boulder in an attempt to resolve their complaint.

The appellants were indicted in the United States District Court for the Middle District of Georgia on the following charges:

Count 1: Conspiracy to import marijuana from Jamaica into the United States, 21 U.S.C. §§ 952, 960, 963 (all appellants);

Count 2: Conspiracy to distribute and to possess with intent to distribute marijuana, 21 U.S.C. §§ 841(a)(1), 846 (all appellants);

Counts 3, 5, 7, 9: Importation of marijuana, or aiding and abetting the same, on August 17, 1980, October 5, 1980, October 10, 1980, and November 23, 1980, 21 U.S.C. § 952(a) and 18 U.S.C. § 2 (all appellants);

Counts 4, 6, 8, 10: Possession with intent to distribute marijuana, or aiding and abetting the same, on August 17, 1980, October 5, 1980, October 10, 1980, and November 23, 1980, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (all appellants);

Counts 12–15: Transporting United States currency in excess of $5,000.00 to Jamaica without filing a report, and aiding and abetting the same, 31 U.S.C. §§ 5316, 5322 and 18 U.S.C. § 2 (Haas and Meester, counts 12–14; Haas, count 15);

Count 16: Conspiracy to attempt to avoid income taxes and to defraud the United States, 18 U.S.C. § 371 (Haas and Sawyer).

The district court granted Haas's and Sawyer's motions for directed verdict on Count 16. The jury found all of the appellants guilty as charged.[1]

On appeal, Meester, Tumulty, Haas and Sawyer jointly and separately challenge their convictions on numerous grounds. All the appellants contend that the district court erred (1) in admitting evidence of the murder of Frank Marrs, (2) in admitting George Kersting's testimony of his drug smuggling activities with McNelis, Frank Corry and others between November, 1979 and April, 1980, (3) in charging the jury on the vicarious liability theory of *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct.

---

**1.** Counts 11 and 17 did not accuse these appellants. Count 11 charged Judy Haas McNelis with engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848. In Count 17, McNelis was indicted for income tax evasion in violation of 26 U.S.C. § 7201. McNelis was also named in the other counts of the indictment. She was a fugitive at the time of the trial but was subsequently recaptured.

1180, 90 L.Ed. 1489 (1946) and (4) in failing to instruct on multiple conspiracies. Meester, Haas and Sawyer complain of the district court's preliminary instruction to the jury with respect to the deliberation process. Meester and Sawyer claim that the evidence was insufficient to sustain their convictions. Meester, Tumulty and Sawyer urge that the district court abused its discretion in denying their motions for severance. Meester and Tumulty appeal from the denial of their motions for recusal, and, finally, Meester contends that her sentence was excessive and confusing. We address each argument in turn.

## II. Admission of Testimony

### (A) Marrs's homicide

All the appellants first take issue with the admission of the evidence of the murder of Frank Marrs. The government contends that evidence of the homicide was relevant to the charges against the appellants because it was an overt act in furtherance of the ongoing drug conspiracies and that the probative value of the evidence outweighed any prejudice accruing to the appellants. The appellants, on the other hand, maintain that evidence of the murder was irrelevant to the issues before the court and even if relevant should have been excluded under Fed.R.Evid. 403.[2] They also claim that the trial court abdicated its responsibility by refusing to exercise its discretion in determining the admissibility of the murder evidence. Haas challenges the admission of the evidence under general principles of conspiracy law and the concept of variance.

■ The threshold issue is the relevancy of evidence of the Marrs's homicide. Fed.R.Evid. 401 defines relevant evidence as that "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." If the evidence is not relevant, Fed.R.Evid. 402[3] precludes its admission and no need arises to consider its exclusion under Rule 403. See Noel Shows, Inc. v. United States, 721 F.2d 327, 329 (11th Cir.1983) (per curiam). The district court's decision as to the relevancy of evidence is reviewable only for abuse of discretion. United States v. Russo, 717 F.2d 545, 551 (11th Cir.1983) (per curiam); United States v. Kopituk, 690 F.2d 1289, 1319 (11th Cir.1982), cert. denied, 461 U.S. 928, 103 S.Ct. 2089, 2090, 3542, 77 L.Ed.2d 300, 1391 (1983); United States v. Roe, 670 F.2d 956, 970 (11th Cir.), cert. denied, 459 U.S. 856, 103 S.Ct. 126, 74 L.Ed.2d 109 (1982).

■ In this case, we cannot say that the district court abused its discretion in determining that evidence of Marrs's homicide was relevant to show the existence of the drug conspiracies. Due to a cash flow shortage arising from problems encountered in moving the third and fourth cargoes of marijuana, McNelis was unable to pay Marrs the $112,000.00 due him for his services in piloting the Queenair and in maintaining the planes. Marrs informed McNelis that he would return the Queenair when he was paid. McNelis had to resolve this problem in order to make the Queenair available for further use in the smuggling operation. Evidence of the killing of Marrs was therefore relevant to establish the conspirators' intent to continue their drug venture.

■ The appellants do not seriously question the district court's relevancy determination. Rather, the principal thrust of their attack is the district court's failure to exclude the evidence under Rule 403.

2. Federal Rule of Evidence 403 states:
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

3. Federal Rule of Evidence 402 provides:
 All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

Rule 403 permits the exclusion of relevant evidence if the district court finds that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice to the defendant. Courts have characterized Rule 403 as an extraordinary remedy to be used sparingly because it permits the trial court to exclude otherwise relevant evidence. *Ebanks v. Great Lakes Dredge & Dock Co.*, 688 F.2d 716, 723 (11th Cir.1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983); *United States v. Pirolli*, 673 F.2d 1200, 1203 (11th Cir.), *cert. denied*, 459 U.S. 871, 103 S.Ct. 157, 74 L.Ed.2d 131 (1982); *United States v. Thevis*, 665 F.2d 616, 633 (5th Cir. Unit B), *cert. denied*, 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303; 458 U.S. 1109, 102 S.Ct. 3489, 73 L.Ed.2d 1370; 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982).[4] The United States Court of Appeals for the Fifth Circuit stated in *United States v. McRae*, 593 F.2d 700 (5th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979)[5] that:

> Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect. As to such, Rule 403 is meant to relax the iron rule of relevance, to permit the trial judge to preserve the fairness of the proceedings by exclusion despite its relevance. It is not designed to permit the court to "even out" the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none.

*Id.* at 707 (emphasis in original). *See also United States v. King*, 713 F.2d 627, 631 (11th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1924, 80 L.Ed.2d 470 (1984). In its Rule 403 analysis, the trial court should consider prosecutorial need for the evidence, *see United States v. Spletzer*, 535 F.2d 950, 956 (5th Cir.1976); Fed.R.Evid. 403 advisory committee note (availability of other means of proof is an appropriate factor in considering whether to exclude evidence on grounds of unfair prejudice), and the probable effectiveness or lack thereof of a limiting instruction, Fed.R. Evid. 403 advisory committee note. The trial court is accorded broad discretion in making this determination which is reviewable only for clear abuse. *King*, 713 F.2d at 631; *Roe*, 670 F.2d at 970; *Thevis*, 665 F.2d at 634.

Although the question is close, we do not believe that the prejudicial effect of the evidence of Marrs's murder substantially outweighs its probative value. The evidence supported the government's position that the appellants continued to participate in conspiracies to import and possess after the November 23, 1980 trip. Furthermore, the government only furnished minimal details of the homicide. Childers testified about the events leading up to and surrounding the murder. A detective from the Palm Beach County Sheriff's office confirmed that Marrs had been shot and his body found in a remote area of Palm Beach County. Marrs's widow told of Sawyer's stated fear of the people who killed Marrs and his possession of a gun when she visited him at his office shortly after the homicide. The government did not seek to introduce photographs of the body or elicit the testimony of John Parrella, the trigger-man. *Cf. United States v. Ostrowsky*, 501 F.2d 318, 323 (7th Cir.1974) (district court abused its discretion in admitting gruesome and unnecessary details of murder of a member of a car theft ring by other members). The district court was aware of the nature of the objections of defense counsel

---

**4.** In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982), the Eleventh Circuit Court of Appeals adopted as precedent all decisions of Unit B of the former Fifth Circuit.

**5.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as precedent all decisions of the former Fifth Circuit decided prior to October 1, 1981.

when it ruled on the admission of the evidence, although it declined suggestions to hear the evidence out of the presence of the jury. In addition, the district court instructed the jury that evidence of the homicide was admitted solely to show that "the participants in [the] conspiracy for the purpose of continuing to carry out [the] conspiracy committed an overt act, an act in furtherance of the conspiracy." The court cautioned that no one was on trial for Marrs's murder and the evidence was not admitted for the purpose of proving the murder. Record, Vol. 5, at 98. The trial court also instructed the jury to determine each defendant's membership in the conspiracies based only upon the acts and statements of that defendant and to consider each defendant's case separately and individually. Record, Vol. 6, at 39, 52. Accordingly, we conclude that the district court properly exercised its discretion in admitting evidence of the homicide. *See United States v. Robinson*, 635 F.2d 363, 365 (5th Cir. Unit B) (per curiam) (when marijuana transaction fell apart, appellants kidnapped individual with intent to hold him until either marijuana or money was forthcoming; court found evidence of kidnapping highly probative of conspiracy to possess with intent to distribute and of specific intent), *cert. denied*, 452 U.S. 916, 101 S.Ct. 3050, 69 L.Ed.2d 419 (1981); *United States v. Johnson*, 575 F.2d 1347, 1366, 1367 (5th Cir.1978) (testimony of hitting, kicking and threats of death in attempt to collect money owed on a marijuana transaction related to substance of offense charged, i.e., conspiracy to import marijuana, because it showed the continuing nature of the conspiracy and was therefore properly admitted), *cert. denied*, 440 U.S. 907, 99 S.Ct. 1213, 1214, 59 L.Ed.2d 454 (1979). *See also United States v. Benton*, 637 F.2d 1052, 1057 (5th Cir. Unit B 1981) ("The prejudicial effect of the evidence may be reduced by the manner in which the evidence is introduced, e.g., elimination of inflammatory or unnecessary details from the presentation, and by cautionary instructions from the trial judge.")

The cases relied on by the appellants do not dictate a contrary result. In *United States v. Sanchez*, 722 F.2d 1501, 1508–09 (11th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984), an agent for the Drug Enforcement Administration (DEA) testified that one of the defendants, while telling the agent that cocaine involved in a shipment had turned out bad, said that "two people, bang bang, get killed because of this," i.e., the bad cocaine. While describing the conversation, the agent pointed his finger at his head as if holding a gun. This court found that the prejudicial effect outweighed the probative value of the evidence but concluded that the trial court's instruction to disregard the testimony and individual polling of the jurors cured any potential prejudice arising from the statement. Similarly, in *United States v. Barnes*, 681 F.2d 717, 724–25 (11th Cir.1982), *cert. denied*, 460 U.S. 1046, 103 S.Ct. 1447, 75 L.Ed.2d 802 (1983), a DEA informant testified that the defendant had made a death threat against a third person. The trial court gave an instruction to disregard the testimony and collectively polled the jury. A panel of this court held that although the statement was prejudicial, the trial court's actions corrected any potential prejudice. Unlike this case, the testimony of uncharged murders and death threats offered in *Sanchez* and *Barnes* had no bearing on the drug conspiracy charges against the defendants and therefore would have no probative value in establishing the existence of such a conspiracy.[6]

(B) *George Kersting's testimony*

The appellants next contend that the district court erred in admitting George Kerst-

---

6. Haas also claims that the evidence was improperly admitted under general principles of conspiracy law and the concept of variance between the indictment and the facts adduced at trial. We find no merit in either of these contentions. As we noted earlier, evidence of the murder was properly admitted as relevant to show the continuing nature of the conspiracies to import and possess. There was also no variance between the indictment and the proof at the trial because evidence of the murder was admitted for the purpose of demonstrating the elements of the charged conspiracies.

ing's testimony concerning his drug smuggling activities with McNelis, Frank Corry and other conspirators between November, 1979 and April, 1980. They assert that the evidence was irrelevant to the charges against them and that the prejudicial effect of admitting the evidence outweighed its probative value. They also maintain that Kersting's testimony was excludable under Fed.R.Evid. 404(b).[7] We find no merit to these arguments.

■ The indictment alleged that the conspiracies began November 1, 1979. Kersting testified that between November, 1979 and April, 1980, he and Frank Corry made several flights to Jamaica for McNelis in order to pick up loads of marijuana. His testimony served to establish a background for the later substantive acts charged in the indictment and was therefore relevant to prove the existence and purpose of the ongoing conspiracies and to establish the significance of later acts. The evidence was not inadmissible simply because one or another of the appellants was not implicated in the ongoing conspiracies until after April, 1980. *See United States v. Michel*, 588 F.2d 986, 1002 (5th Cir.) (one who knowingly joins a conspiracy is liable for the acts of his coconspirators occurring before his association with the conspiracy), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979); *United States v. Reynolds*, 511 F.2d 603, 607 (5th Cir.1975) (same). If the appellants knowingly joined an ongoing conspiracy, it is immaterial that they were not aware of every detail of the operation. *United States v. Alvarez*, 755 F.2d 830, 853 (11th Cir.1985); *United States v. Bates*, 600 F.2d 505, 509 (5th Cir.1979).

■ Even assuming the relevance of Kersting's testimony, the appellants urge that it should have been excluded under Rule 403. They claim they were unduly prejudiced by the testimony because it al-

lowed the jury to draw the conclusion that they acted in conformity with the criminal acts described by Kersting. As pointed out earlier, the district judge has wide discretion in determining admissibility of evidence in the face of a Rule 403 objection. We cannot say that he abused that discretion in this case.

■ Finally, the testimony cannot be characterized as extrinsic evidence excludable under Rule 404(b). That rule deals with acts committed by the defendant himself. *Bates*, 600 F.2d at 509. Here, the challenged evidence documented crimes committed by other members of the conspiracy, not the appellants themselves. Furthermore, the evidence was intertwined with the evidence of the ongoing conspiracies and so cannot be labeled "extrinsic." *United States v. Kloock*, 652 F.2d 492, 494 (5th Cir. Unit B 1981); *United States v. Aleman*, 592 F.2d 881, 885 (5th Cir.1979).

III.. *Challenges to Jury Instructions*

(A) *Pinkerton v. United States instruction*

■ Under the well-settled principle laid down in *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), each member of a conspiracy can be found guilty of a substantive offense committed by a coconspirator during the course of and in furtherance of the conspiracy, unless the act "did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *Id.* at 647–48, 66 S.Ct. at 1184, 90 L.Ed. at 1497. *See also Alvarez*, 755 F.2d at 847; *United States v. Johnson*, 730 F.2d 683, 690 (11th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 186, 83 L.Ed.2d 119 (1984); *United States v. Moreno*, 588 F.2d 490, 493 (5th Cir.), *cert. denied*, 441 U.S. 936, 947, 99 S.Ct. 2061, 2168,

---

**7.** Rule 404(b) states as follows:

*Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity there-

with. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

60 L.Ed.2d 666, 1049 (1979). Numerous decisions reflect this court's acceptance of the *Pinkerton* theory of vicarious liability in cases involving drug conspiracies and substantive drug violations. *See, e.g., United States v. Carrascal-Olivera,* 755 F.2d 1446, 1451–52 (11th Cir.1985); *United States v. Luis-Gonzalez,* 719 F.2d 1539, 1545 n. 4 (11th Cir.1983); *United States v. Harris,* 713 F.2d 623, 626 (11th Cir.1983); *United States v. Monaco,* 702 F.2d 860, 881 (11th Cir.1983); *United States v. Diaz,* 655 F.2d 580, 584–85 (5th Cir. Unit B 1981), *cert. denied,* 455 U.S. 910, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982); *United States v. Hodges,* 606 F.2d 520, 523 (5th Cir.1979), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 708, 62 L.Ed.2d 671 (1980); *Michel,* 588 F.2d at 999; *United States v. Decker,* 543 F.2d 1102, 1103–04 (5th Cir.1976), *cert. denied,* 431 U.S. 906, 97 S.Ct. 1700, 52 L.Ed.2d 390 (1977). A defendant charged with conspiracy and the substantive offense "normally will be responsible for the substantive crime under the *Pinkerton* theory and also may be responsible for the substantive crime under an aiding and abetting theory." *Monaco,* 702 F.2d at 881 (footnote omitted).

In this case, the appellants were charged in the substantive counts with aiding and abetting the commission of the offenses. The trial court submitted the substantive counts to the jury with both a *Pinkerton* [8] and an aiding and abetting instruction. The appellants now attack the trial court's *Pinkerton* instruction. They state that the indictment charged them only with aiding and abetting the commission of the substantive offenses and the government did not disclose its intention to rely on *Pinkerton* until they moved for judgments of acquittal on the substantive counts following the government's case. They seem to suggest that they were thereby prejudiced because they had no notice of the government's reliance on any theory of criminal liability other than aiding and abetting.

This is essentially an argument that the *Pinkerton* instruction constituted a variance from the charges contained in the indictment. To benefit from any such variance, the appellants would have to demonstrate prejudice. *See Monaco,* 702 F.2d at 881 n. 39 (variance between bill of particulars and giving of *Pinkerton* and aiding and abetting charges). In this case, the appellants only vaguely suggest that they were prejudiced by the court's instruction or that the charge was inappropriate in this case. The government's intention to rely on *Pinkerton* was made known at the close of its case, so the appellants were not denied an opportunity to effectively present their defense. Indeed, none of the appellants implied at the trial that no other conspirator imported or possessed marijuana during the course of the conspiracies. We conclude that appellants have not shown the necessary prejudice and therefore find no merit to this assignment of error.[9]

8. The court instructed the jury that:
 If you ladies and gentlemen find a defendant guilty of conspiracy, you may also find that particular defendant guilty of a substantive offense, provided that the evidence as to the substantive offense proves the offense beyond a reasonable doubt; shows that the offense was committed by a member of the conspiracy pursuant to the conspiracy and at the time it was committed, the particular defendant was a member of the conspiracy. So, it is that a defendant may be found guilty of a substantive offense even though he did not participate in the act constituting that offense. The reason for this is that under the law, a member of a conspiracy who commits a substantive offense pursuant to a conspiracy is the agent of all who are then members of the conspiracy and all who are members may be found guilty on account of the conduct of their agent, their fellow member of the conspiracy. So, in determining whether or not each defendant is guilty of the substantive offenses, you may consider the conduct of the defendant in question, as well as the conduct of any member of the conspiracy if you have found the defendant to be a member thereof, as long as those requirements are met.
 Record, Vol. 6, at 46.

9. We similarly reject the appellants' remaining arguments on this point. Meester made no objection in the trial court about the absence of "foreseeability" language in the *Pinkerton* charge. Thus, reversal is warranted only if the charge constituted plain error. Read in its en-

### (B) *Failure to instruct on multiple conspiracies*

 All the appellants, particularly Tumulty, allege a violation of Fed.R.Crim.P. 30 [10] predicated on the district court's failure to instruct on multiple conspiracies. The record reflects that at a conference held following the close of the defendants' evidence on October 14, 1983, the court requested counsel to submit proposed jury instructions. At this conference, the court provided counsel with a set of instructions previously used in a similar case. Record, Vol. 7, at 195. These instructions contained a charge on multiple conspiracies. Prior to instructing the jury on October 17, 1983, the judge again convened a conference to entertain requests to charge. The court stated that it had given counsel copies of the instructions "not cause I'm going to use it but to look at it as what I have given." Record, Vol. 6, at 9. Tumulty made no requests to charge, much less requested a specific charge on multiple conspiracies. The court allowed Tumulty's counsel to argue a multiple conspiracy theory during closing arguments. The court, however, did not instruct on such a theory. When the trial court solicited objections following its jury charge, Tumulty's counsel stated only that: "My objections have all been stated, Your Honor." Record, Vol. 6, at 62. The appellants now allege that the court violated Fed.R.Crim.P. 30 because it did not inform counsel prior to closing argument that it did not intend to instruct on multiple conspiracies. Tumulty seeks to rely on an objection to the court's failure to charge on multiple conspiracies which was made by counsel for Sawyer.[11]

 The appellants did not request a specific instruction on multiple conspiracies nor voice a sufficient objection at trial to the court's failure to so instruct. The exception made by Sawyer's counsel did not comply with the requirement of Fed.R. Crim.P. 30 that a party "stat[e] distinctly the matter to which he objects and the grounds of his objection." *See also United States v. McCracken,* 488 F.2d 406, 413–14 (5th Cir.1974) (challenge to instruction

---

tirety, the instruction does not disclose any prejudicial error. *See United States v. Mills,* 704 F.2d 1553, 1565 n. 7 (11th Cir.1983) (*Pinkerton* instruction), *cert. denied,* — U.S. —, 104 S.Ct. 3517, 82 L.Ed.2d 825 (1984). Haas's convictions for violations of the currency laws are amply supported because the acts of transporting money in excess of $5,000.00 beyond a United States border without filing the required report were a reasonably foreseeable consequence of the drug conspiracy. See discussion of evidence supporting Meester's convictions, *infra,* at 882. Tumulty's contention that application of *Pinkerton* denied her due process and exposed her to possible double jeopardy can best be described as cursory. The indictment provided adequate notice of the substantive offenses with which she was charged. Finally, Sawyer's contention that the instruction was not proper as to him rests on his allegation of insufficiency of the evidence and will be considered below.

**10.** Federal Rule of Criminal Procedure 30 states:

At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. At the same time copies of such requests shall be furnished to adverse parties. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury and, on request of any party, out of the presence of the jury.

**11.** The following exchange occurred between Sawyer's counsel and the court:

Mr. Erion: Your Honor, you also charged that they—they're instructed the jury that there were two separate conspiracies charged in the indictment.

The Court: Yes sir.

Mr. Erion: And, then you stated that you charged on the—just the theory of separate conspiracies in relation only to those two but you did not instruct the Jury that they could not find a defendant guilty of participating in some conspiracy other than those, just charged on the general theory of conspiracy.

The Court: All right, yes, sir. All right. The reason for that is I don't foresee of any case.

Mr. Erion: Well, I would respectfully except that.

The Court: All right.

Record, Vol. 6, at 57–58.

should be phrased "in terms of specific elements of prejudice"). Therefore, the appellants must show that failure to give the instruction amounted to plain error. *United States v. White,* 611 F.2d 531, 536 (5th Cir.), *cert. denied,* 446 U.S. 992, 100 S.Ct. 2978, 64 L.Ed.2d 849 (1980); *United States v. Wentland,* 582 F.2d 1022, 1025 (5th Cir. 1978), *cert. denied,* 439 U.S. 1133, 99 S.Ct. 1056, 59 L.Ed.2d 96 (1979). Plain error is "error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity and public reputation of judicial proceedings." *United States v. Russell,* 703 F.2d 1243, 1248 (11th Cir.1983) (citation omitted).

■ Our review of the record indicates no error rising to the level of plain error. There was ample evidence from which the jury could find a single conspiracy to import and a single conspiracy to possess. A single conspiracy does not become many simply because of the changing composition of the personnel comprising the conspiracy or because some members performed only a single function. *Bates,* 600 F.2d at 509. Furthermore, the trial court instructed the jury that it had to find that each defendant was a member of the overall conspiracy charged in the indictment before the defendant could be convicted on the conspiracy count. Record, Vol. 6, at 41–42. The court also charged that the jury must find that the defendant was a member of the conspiracy at the time of the substantive offense before it could find the defendant liable for those counts. Record, Vol. 6, at 46. The jury obviously found that appellants were members of the charged conspiracies. There was sufficient evidence to support this finding.

### (C) "Chit chat" instruction

■ Meester, Haas and Sawyer fault the trial court's instruction at the beginning of trial concerning the deliberation process. Although no objection to the charge was made at the trial, they now contend that the language that "[t]here's nothing wrong with chit chat" denied them their sixth amendment right to trial by an impartial jury.[12]

Having failed to object during the trial, these appellants can succeed on appeal only if the instruction was plain error. *Bates,* 600 F.2d at 510. A close examination of the entire charge reveals a lack of merit to this assignment of error. The objectionable language was coupled with a lengthy admonition by the court that the jurors should refrain from reaching a decision until all the evidence was submitted, closing arguments concluded and after the charge of the court. The language employed by the court minimized any danger of jury partiality by repeatedly emphasizing the need for the jurors to keep an open mind until the conclusion of the case. We therefore conclude that the jury instruction does not constitute plain error requiring a reversal of the convictions. *See United States v. Lemus,* 542 F.2d 222, 223–24 (4th Cir. 1976) (per curiam) (use of harmless error doctrine in factually similar case where defendant objected to instruction), *cert. de-*

---

12. As viewed in context, the instruction stated:
 Now, only when you have heard all the evidence, the argument of the lawyers and the instructions of the Court, will you be in the position to make up your mind about this case. Until we reach that point, don't do anything to make up your mind. We know it's normal for fourteen people to talk about the case when you're together at a break, talk about a witness or in general. There's nothing wrong with chit chat. The prohibition is that you do nothing to make up your mind as to whether or not you will believe a witness or more than one witness or whether or not it then looks like somebody is guilty or inno-

cent. Just keep those decisions in reserve until we reach the end of the case. Remember that a law suit is just like a novel. You know when you read a novel, you don't know the whole story until you get to the last word on the last page and when you're acting as a juror in a criminal case, you don't know the whole story until you have heard all the evidence and the argument and the law. So, only then will you know the whole story and be in position to make up your mind about the case. So, please do nothing to make up your mind until we reach that point.
Record, Vol. 3, at 5–6.

*nied,* 430 U.S. 947, 97 S.Ct. 1584, 51 L.Ed.2d 794 (1977).

### IV. *Sufficiency of the Evidence*

Meester and Sawyer claim that the evidence against them was insufficient to support their convictions. We must view the evidence in the light most favorable to the government, accepting all reasonable inferences which support the verdict, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942); *Russo,* 717 F.2d at 549, and affirm the conviction if a reasonable trier of fact could conclude that the evidence establishes guilt beyond a reasonable doubt. *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except guilt. *Id.* The jury is free to choose among reasonable constructions of the evidence. *Id.*

#### (A) *Meester*

Meester does not attack her convictions for conspiracy to import marijuana and for the substantive act of importation of the August 17, 1980 marijuana shipment. Rather, she urges reversal of her convictions for conspiracy to possess with intent to distribute and for the substantive acts of possession with intent to distribute the August 17, 1980 cargo, importation and possession of the October and November, 1980 shipments and currency violations.

■■■ In order to convict a defendant of participation in a drug conspiracy, the government must prove that a conspiracy existed, that the defendant knew of the conspiracy, and that armed with this knowledge, the defendant voluntarily became a member of the conspiracy. *Russo,* 717 F.2d at 549; *United States v. Badolato,* 701 F.2d 915, 919–20 (11th Cir.1983); *United States v. Marszalkowski,* 669 F.2d 655, 661 (11th Cir.), *cert. denied,* 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 167 (1982). The government need not prove that the defendant had knowledge of all details or phases of the conspiracy. Rather, it will suffice to show that the defendant knew the essential nature of the agreement. *Alvarez,* 755 F.2d at 853; *United States v. Blasco,* 702 F.2d 1315, 1330 (11th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 275, 276, 78 L.Ed.2d 256 (1983). A defendant's knowing participation in the conspiracy may be established by proof of acts committed by him that furthered the purpose of the conspiracy. *United States v. Bain,* 736 F.2d 1480, 1485 (11th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 340, 83 L.Ed.2d 275 (1984). The elements of the conspiracy may be proved by circumstantial evidence. *Blasco,* 702 F.2d at 1330.

■■■ Meester does not deny the existence of a conspiracy to possess marijuana. She does contend that the government failed to prove her knowing participation in the conspiracy. She argues that, at best, the evidence established her participation in the conspiracy to import marijuana. The evidence at the trial disclosed that in April, 1980, Meester drove away from the Valdosta residence of her father, Robert Haas, in a car loaded with marijuana. In August, 1980, she met with several of the coconspirators to make plans to bring in a load of marijuana. She subsequently traveled to Jamaica to make the necessary arrangements and handled the money transaction with the Jamaican source. Upon her return to Valdosta following the August 17, 1980 trip, Meester paid cash for a Datsun 280ZX automobile. She again traveled to Jamaica in September, 1980. In December of that year, she was present at a stash house when McNelis sought to enlist the aid of Meester's boyfriend in selling marijuana. Meester's behavior and her association with other coconspirators, when viewed in the totality of all the evidence, indicate that she was well aware of the essential object of the conspiracy and was an active participant. *See United States v. Cole,* 704 F.2d 554, 557 (11th Cir.1983) (association with coconspirators a factor to be considered). We therefore hold that the evidence was sufficient to convict Meester of conspiracy under 21 U.S.C. § 846.

As noted above, Meester does not challenge her conviction for conspiracy to import. Therefore, under the principle of *Pinkerton v. United States,* she is chargeable as a member of the conspiracy for the substantive acts of importation committed by her coconspirators in October and November, 1980. There is no merit to the argument that these acts of importation were not a reasonably foreseeable consequence of the agreement. Having found ample evidence to sustain Meester's conviction for conspiracy to possess, we likewise find her liable for the substantive acts of possession by her coconspirators.

Finally, Meester challenges her convictions for knowingly and willfully transporting currency in an amount exceeding $5,000.00 beyond a United States border without filing the report required by 31 U.S.C. § 5316(a)(1)(A) in violation of 31 U.S.C. § 5322(b). There need not be independent evidence of Meester's direct participation in each substantive count for which she was convicted because, under *Pinkerton,* she can be guilty of the substantive offense if there existed sufficient evidence for the jury to conclude that the acts were committed by other conspirators and that such acts were a reasonably foreseeable part of the conspiracy. Such a finding is supported by the record. Kersting testified that on the dates in question, he carried sums of money well in excess of $5,000.00 to Jamaica with the knowledge that he was required to file Customs Form 4790. Record, Vol. 4, at 128–31. None of the conspirators filed the required form. *See United States v. Warren,* 612 F.2d 887 (5th Cir.) (en banc) (defendant must have knowledge of reporting requirement and specific intent to commit crime), *cert. denied,* 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980); *United States v. Granda,* 565 F.2d 922 (5th Cir.1978) (same). These acts were designed to facilitate the importation and possession of marijuana, the very goals of the charged conspiracies. They were thus clearly foreseeable. The evidence was sufficient to sustain Meester's conviction on these substantive counts.

(B) *Sawyer*

Sawyer also urges reversal of his convictions on the conspiracy and substantive counts because the government did not produce sufficient evidence linking him to the crimes. Here, the evidence showed that Sawyer was acquainted with many of the coconspirators. He provided legal services to Frank Corry, McNelis's original pilot, and later to McNelis herself. Sawyer established several corporations which were subsequently employed by McNelis and Corry to purchase planes for smuggling purposes. Documents introduced by the government reflect that these corporations were ostensibly formed for persons other than McNelis and Corry. On one occasion, Sawyer was seen at a hotel with McNelis and Corry about the time of the purchase of one of the planes. He arranged for the return of one of McNelis's planes seized by Florida authorities and also obtained her release from jail on one occasion. Documentary evidence reflected over 100 phone calls between McNelis's residence and Sawyer's office between June, 1980 and December, 1980. When McNelis terminated her relationship with Frank Corry, Sawyer introduced her to his close friend Frank Marrs. He counseled with McNelis on the collection of a drug debt, which could hardly be described as legal advice. In December, 1980, Sawyer received a quantity of marijuana from McNelis, presumably in payment for his services. Finally, there was testimony that he feared for his life following the murder of Frank Marrs.

Sawyer's pervasive involvement with coconspirators and his receipt of marijuana from McNelis amply support the inference that he was aware of the ongoing conspiracies to import and possess marijuana and voluntarily associated himself with their purpose. As aptly observed by the district court, Sawyer was an essential "cog of respectability" whose involvement served to conceal the true use of the airplanes and thereby facilitate their retrieval after seizure. Viewing the evidence as a whole, it was sufficient to convict Sawyer of conspir-

acy under 21 U.S.C. §§ 846, 963. *See Bain,* 736 F.2d at 1485; *Cole,* 704 F.2d at 557. Having sustained Sawyer's conspiracy convictions, we likewise uphold his convictions on the substantive counts under the rationale of *Pinkerton v. United States.*[13]

## V. *Remaining Assignments of Error*

### (A) *Motions for severance*

Meester, Tumulty and Sawyer assert that the district court abused its discretion in denying their motions for a severance. They primarily argue that they were prejudiced by the "spill-over" effect of evidence against other defendants. Tumulty sought a severance of counts and defendants. Relying on her reasoning that the evidence proved multiple conspiracies to import and possess, she claims that the evidence did not substantiate the participation of each defendant in all phases of the smuggling operation. This failure to sever, she says, resulted in an implication of guilt.

Fed.R.Crim.P. 8(b),[14] rather than 8(a), governs joinder in cases of multiple defendants. *United States v. Butera,* 677 F.2d 1376, 1384 (11th Cir.1982), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983). Joinder under Rule 8(b) is proper where the indictment charges the defendants with participation in a single conspiracy and further charges some but not all of the defendants with substan-

tive counts arising out of the conspiracy. *Alvarez,* 755 F.2d at 857; *United States v. Zielie,* 734 F.2d 1447, 1463 (11th Cir.1984), *cert. denied,* ——— U.S. ———, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985). As a general rule, defendants jointly indicted should be tried together in the interest of judicial economy. *United States v. Sans,* 731 F.2d 1521, 1533 (11th Cir.1984), *cert. denied,* ——— U.S. ———, 105 S.Ct. 791, 83 L.Ed.2d 785 (1985). Even if joinder under Rule 8(b) is proper, however, severance may be granted in the discretion of the trial court pursuant to Fed.R. Crim.P. 14[15] if the court determines that prejudice will result from the joinder. *Alvarez,* 755 F.2d at 857; *Zielie,* 734 F.2d at 1464. Denial of a motion for severance is reviewable only for abuse of discretion. *Id.*

In order to demonstrate an abuse of discretion, the appellant must show "compelling prejudice" arising from the decision not to sever. *Id. See also Sans,* 731 F.2d at 1533; *Badolato,* 701 F.2d at 923. "Compelling prejudice" has been defined by this circuit as the jury's inability to separately appraise the evidence as to each defendant and render a fair and impartial verdict. *Marszalkowski,* 669 F.2d at 660. To establish prejudice resulting from the "spill-over" effect, the appellants would have to demonstrate the jury's inability to make an individualized determination as to each defendant. It is not enough to show that acquittal would have been more likely had

---

**13.** There is no merit to Sawyer's vague allegation that the district court erred in admitting coconspirator statements in violation of *United States v. James,* 590 F.2d 575 (5th Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), because the statements were not made in furtherance of the conspiracy. He does not even identify the inadmissible declarations. We conclude that the district court's finding that *James* was satisfied was not clearly erroneous. *Alvarez,* 755 F.2d at 855.

**14.** Federal Rule of Criminal Procedure 8(b) states:

*Joinder of Defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or

more counts together or separately and all of the defendants need not be charged in each count.

**15.** Federal Rule of Criminal Procedure 14 provides:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

the defendant been tried separately. Some degree of bias is inherent in a joint trial. *Alvarez*, 755 F.2d at 857. Furthermore, demonstrating that the evidence was stronger against a co-defendant does not satisfy the burden. *United States v. Johnson*, 713 F.2d 633, 640 (11th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984). The fact that every member of the conspiracy was not present at every stage of the conspiracy is not such a disparity in the evidence as would confuse the jury. *Id.* An instruction that the jury should consider the case against each defendant separately limits the likelihood of a "spill-over" effect. *Id.*

In this case, the trial involved only five defendants and the evidence was presented in four days. The trial court instructed the jury to consider each defendant and each charge separately. Record, Vol. 6, at 52. The jury deliberated over nine hours before reaching its verdict. Based on the foregoing, we conclude that none of the appellants has made the requisite showing of compelling prejudice.

(B) *Motions for recusal*

Prior to the trial, Meester and Tumulty filed motions seeking to disqualify the trial judge. The district court denied the motions. Meester's motion alleged bias, prejudice and lack of impartiality on the part of the district judge because of a phone call made by him to Meester's surety after Judy Haas McNelis, Meester's sister, escaped from jail. The judge is reported to have stated that he had information of Meester's planned failure to appear for tri-al and that he was having her watched by the FBI. Meester also claimed that the judge's actions during the trial, particularly his denial of her motion for disclosure of any electronic surveillance of communications between Meester and her attorney, further established the requisite bias. Tumulty's motion was based on the trial court's denial of her motions for reduction of bond. She attacked as improper the court's *in camera* review of evidence presented by the government in opposition to her motions.

The motions to recuse were predicated on two statutes which govern the recusal of federal district judges on the grounds of bias, prejudice or lack of impartiality. 28 U.S.C. §§ 144, 455.[16] It is well established that an allegation of bias sufficient to require disqualification under either section 144 or section 455 must demonstrate that the alleged bias is personal as opposed to judicial in nature. *United States v. Phillips*, 664 F.2d 971, 1002 (5th Cir. Unit B 1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354; 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982); *Phillips v. Joint Legislative Committee*, 637 F.2d 1014, 1020 (5th Cir. Unit A 1981), *cert. denied*, 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 483 (1982). The alleged bias "must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Clark*, 605 F.2d 939, 942 (5th Cir.1979) (per curiam). Thus, a motion for disqualification may not ordinarily be based on the judge's rulings in the same case. *United States v. Phillips*, 664 F.2d

---

**16.** 28 U.S.C. § 144 states:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

28 U.S.C. § 455 provides in pertinent part:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party. . . .

at 1002–03; *Phillips*, 637 F.2d at 1020. An exception to the general rule that the bias must stem from an extrajudicial source exists where "such pervasive bias and prejudice is shown by otherwise judicial conduct as would constitute bias against a party." *Davis v. Board of School Commissioners*, 517 F.2d 1044, 1051 (5th Cir.1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976).

◼ Here, neither appellant has demonstrated the requisite personal bias. The trial judge learned of McNelis's escape in his capacity as presiding judge. He responded to the escape in a manner designed to ensure Meester's appearance in court. His comments to Meester's bondsman were of a judicial, rather than a personal, nature. Meester's accusations of personal bias are undercut by the fact that the judge allowed her to remain free on appeal bond and granted her post-trial request for permission to travel. The judge's denial of her motion for disclosure of electronic surveillance likewise does not support a finding of personal bias because, again, he acted on the motion in his capacity as presiding judge.

Tumulty's factual allegations also do not raise an inference of personal bias or prejudice. Rather than seek prompt appellate review with respect to the trial court's *in camera* review of the evidence, Tumulty filed a motion to disqualify the judge. The factual allegations of her affidavit, which we must accept as true, show that the judge received the information in his judicial capacity. Accordingly, she has failed to show bias stemming from an extrajudicial source. *See United States v. Phillips*, 664 F.2d at 1003. Tumulty also failed to comply with the timeliness requirement of section 144. The trial commenced on October 11, 1983. Tumulty filed her motion on October 7, 1983. From these facts, we cannot say that the district judge abused his discretion in denying the recusal motions.

(C) *Sentence review*

◼ Meester challenges her sentence on the ground that it is unclear whether she was sentenced to ten years of actual confinement before becoming eligible for parole or to ten years with parole eligibility at the completion of one-third that term. *See* 18 U.S.C. § 4205(a) (prisoner eligible for release on parole after serving one-third of term). A sentence " 'should reveal with fair certainty the intent of the court and exclude any serious misapprehensions by those who must execute them. The elimination of every possible doubt cannot be demanded.' " *Montos v. Smith*, 406 F.2d 1243, 1246 (5th Cir.1969) (quoting *United States v. Daugherty*, 269 U.S. 360, 363, 46 S.Ct. 156, 157, 70 L.Ed. 309, 313 (1926)). In determining the terms of the sentence, the intent of the sentencing judge is controlling and that intent is ascertained by reference to the entire record. *United States v. Purcell*, 715 F.2d 561, 563 (11th Cir.1983) (citations omitted).

In pronouncing sentence in open court, the court stated:

> I'm going to impose on each and everyone of you the maximum sentence of imprisonment and fine on each and every count to run consecutive until the following totals are reached. As to Mr. Haas, 20 years, a $100,000 fine to be followed by a special parole term of 10 years. When the total is reached, then the sentences run concurrently. On Ms. Tumulty, 20 years, $100,000 fine, special parole term of 10 years. Ms. Meester, 10 years, a $5,000 fine, special parole term of 5 years.

Record, Vol. 6 at 90–91. The written judgment and commitment order provided the maximum terms of imprisonment for the various counts. Service of these sentences was "to run consecutively until a total confinement of TEN (10) YEARS is reached; thereafter, counts shall run concurrently," for a "total sentence of TEN (10) YEARS confinement, a fine of FIVE THOUSAND ($5,000.00) DOLLARS and a Special Parole Term of FIVE (5) YEARS." Record, Vol. 2, at 492. From these recitations, it is evident that the trial judge clearly intended to sentence Meester to a prison term of ten years. Under 18 U.S.C. § 4205(a), she will

be eligible for release on parole after serving one-third of this sentence. There is no merit to her argument that her sentence is unconstitutionally excessive.

The judgments of conviction are AFFIRMED.