**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 97-1021
_____

United States of America,     *
             *
   Plaintiff - Appellee,   *
             *
   v.          *
             *
Brian Dierling,       *
             *
   Defendant - Appellant.  *

_____

No. 97-1023       Appeals from the United States District
            Court for the Eastern District of Missouri.

_____

United States of America,     *
             *
   Plaintiff - Appellee,   *
             *
   v.          *
             *
Mark Perkins,       *
             *
   Defendant - Appellant.  *

_____

No. 97-1024

_____

| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| Louis Younger, | * |
| | * |
| Defendant - Appellant. | * |

_____

No. 97-1026

_____

| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| Arthur Holt, also known as Artie, | * |
| | * |
| Defendant - Appellant. | * |

_____

Submitted:  September 11, 1997
Filed:

_____

Before HANSEN, ROSS, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Appellants Brian Dierling, Louis Younger, Arthur Holt, and Mark Perkins appeal their convictions and sentences for conspiracy to manufacture, distribute, and possess with intent to distribute methamphetamine in violation of 21 U.S.C. § 846. They seek a new trial or resentencing because of claimed errors, including improper admission of evidence, a joint trial, failure of the district court[1] to provide immunity to their witnesses and of the government to furnish Brady material, and several sentencing issues. We affirm.

I.

A one count indictment charged appellants with a conspiracy to manufacture and distribute methamphetamine in Missouri and Illinois. There was evidence at trial that Dierling, Younger, and Holt were manufacturing methamphetamine in a clandestine laboratory on Dierling's property and that they and Perkins were distributing the drug to unindicted coconspirators for resale and also directly to users. Dierling oversaw the manufacturing operations, the procurement of materials for the laboratory, and the drug distribution. Younger was Dierling's partner and held recipes for manufacturing methamphetamine. The involvement of Holt and Perkins was less important, but each sold methamphetamine to dealers and users and each picked up drugs and dropped off money at Dierling's property. Holt also assisted in the manufacturing operations.

There were a number of sources of evidence about the conspiracy, including detailed testimony from associates. Bobby Collis testified that Dierling told him he was making methamphetamine in one pound blocks, that Arthur Holt was "moving crank

_____

[1]The Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri.

for him," and that Holt had been arrested with his drugs. Cindy Craig, who lived with Younger, testified that he told her that he and Dierling made and sold drugs together, that he showed her as many as ten recipes for making methamphetamine, and that he described to her their manufacturing operations and the quality of the drugs they were making. She once went to Dierling's house with Younger and saw conspirators packaging and weighing drugs in the bedroom.

Stephanie Nickell reported that she had seen Dierling, Younger, and Danny Craig cooking methamphetamine at Dierling's house and had observed cantaloupe-sized quantities of methamphetamine at Younger's residence during the period she was selling drugs for him. She helped Dierling, Holt, and Younger package methamphetamine and took some to sell herself. Craig told her that he was also selling methamphetamine for Dierling. Nickell bought items for the methamphetamine lab for Younger and Dierling. Dierling gave her a handgun for her protection because drug dealers in the area were selling poor quality methamphetamine and attributing it to him; he feared reprisals.

Candy True testified that Younger delivered drugs to an unindicted coconspirator for resale and that she went with him to Dierling's farm where he picked up methamphetamine. She testified that on another occasion she went to the farm with Perkins, Holt, and Holt's daughter; Holt went into the barn to get methamphetamine. She also saw Younger, Holt and Perkins all deliver drugs on separate occasions to a coconspirator who would resell them.

Michelle Crawford testified that she sold ten "eight balls" of methamphetamine on a daily basis for Holt, whose source was Dierling. She saw Dierling deliver a six-inch wide, four-inch tall amount of methamphetamine to Holt. In October of 1994 she went to an apartment with Holt where she saw Dierling with some ten pounds of methamphetamine, money, and guns. Holt took methamphetamine from the apartment and in return left three envelopes which contained money she had previously counted.

-4-

Between October of 1994 and May of 1995, Crawford, Holt and/or Perkins made approximately 10 trips to Dierling's farm and obtained at least five pounds of methamphetamine on each trip, which they would package in smaller quantities for distribution. Holt and Perkins also went once or twice a week without her to get drugs from Dierling.

George Heller testified that Younger took him to Dierling's property to tow a car, and he saw Holt and Dierling there with guns and radios and noticed the area smelled like chemicals. He overheard Holt tell Younger that "[i]f anything goes wrong, we'll know who brought them here."

Law enforcement officers also obtained evidence about the existence of the conspiracy. Missouri state troopers twice arrested Perkins and Holt, seizing over $11,000 cash, weapons and methamphetamine.[2] An undercover officer purchased methamphetamine from Holt on one occasion and discussed with him the resale of the drugs and the fact that he might need more later. A search of Holt's home revealed digital scales, plastic baggies, and drug notes. Police also seized methamphetamine from Holt's car and over $2,800 cash from his person when they responded to a disturbance call at a bar. A deputy sheriff arrested Dierling and removed approximately $1,100 cash, methamphetamine, and syringes from him. Officers from the Putnam County sheriff's department seized syringes and methamphetamine during a search of Younger's home, and officers saw materials commonly used in methamphetamine laboratories in Dierling's barn when they went to his property to answer a domestic dispute call.

Appellants were found guilty after a two and a half week jury trial. The district court then received additional evidence at a sentencing hearing and found that the

---

[2]Both Holt and Perkins told Michelle Crawford they had been carrying drugs for Dierling when they were arrested.

conspiracy involved 10 to 30 kilograms of methamphetamine and applied four level sentence enhancements to Dierling and Younger for their roles in the conspiracy and two separate enhancements to Dierling for obstruction of justice. Dierling and Younger were sentenced to life imprisonment, Holt to 360 months, and Perkins to 235 months.

Appellants argue on appeal that they are entitled to a new trial because the court admitted inflammatory evidence about acts that were neither foreseeable nor in furtherance of the conspiracy, refused to sever their cases despite the risk that evidence of unrelated acts by coconspirators would improperly influence the jury, and refused to provide judicial immunity for their witnesses. They also rely on the government's alleged failure to disclose material required by Brady v. Maryland, 373 U.S. 83 (1963), and they contend that the court improperly considered unreliable testimony in calculating the amount of drugs involved in the conspiracy. Finally, Dierling challenges the enhancements for his leadership role and for obstruction of justice.

## II.

## A.

All appellants claim they are entitled to a new trial because of inflammatory evidence they view as unrelated to the conspiracy. They say they were unfairly prejudiced by evidence of the killing of Danny Craig, the burning of Dierling's barn, the shooting of a deputy sheriff, and the discovery of a cache of weapons on Dierling's property.

The government contends that the evidence about the killing was directly related to the conspiracy because Dierling and Younger killed Craig, a coconspirator, over a drug debt he owed Dierling. Craig was a heavy methamphetamine user, and he participated in the conspiracy's manufacturing operations, packaged methamphetamine for sale, and dealt drugs for Dierling. In late May or early June of 1995, Craig took a

weekend trip for the purpose of selling drugs, but used them himself instead. Craig later told government witness Candy True that Dierling was upset with him and that he owed Dierling drugs and money. Michelle Crawford testified that soon thereafter Perkins and Holt administered a severe beating to Craig, explaining to him that "Brian said you shouldn't have did what you did."

Stephanie Nickell testified that in the spring of 1995, Dierling told her he had placed a contract for $10,000 on Craig's life, and on June 9 he and Younger asked her to take them to Craig. She led them to a party attended by Craig where Dierling yelled that Craig had his money. Dierling ordered Craig to drive out to his house with Nickell; Dierling and Younger followed. At Dierling's house Nickell saw Younger and Dierling prod Craig into a utility room near the living room. She heard Craig scream and then two gunshots. Younger came out of the utility room and asked her for the keys to her vehicle. She went outside with him and saw Craig lying motionless in the back of her truck with gunshot wounds in his chest. Dierling, Younger, and Nickell then drove in the truck to Younger's house. On the way Dierling indicated that Craig would not be ripping off anyone any more. Once on Younger's property, Younger and Dierling pulled Craig from the truck and got a knife out of it. Nickell heard chopping sounds and then saw Dierling hold up Craig's severed head by the hair. Younger threatened that he would do the same thing to her if she crossed him. The three then drove back to Dierling's property after stopping to show the head to an acquaintance, Jess Mahurin. Dierling drove off in Younger's car, and Younger and Nickell continued on to a friend's house in her truck, stopping at a car wash along the way to clean the bed of the pickup.

The government also presented evidence that Dierling burned his barn and house to conceal evidence of the conspiracy. A police officer testified that he went to Dierling's home on July 15, 1995, in response to a domestic dispute call, and saw materials commonly used to manufacture methamphetamine in the barn. A week later, a neighbor noticed Dierling drive up his driveway, remain there briefly, and then leave

shortly before his house and barn were seen to be on fire. An investigator from the Missouri Division of Fire Safety concluded that the fire had been set intentionally, but could not say who started the blaze. Police arrested Dierling in connection with the arson on the following day and seized $1,100 and some methamphetamine from his person. Bobby Collis testified that while they were in jail together Dierling admitted to him that he had set the fire in order to destroy parts of a methamphetamine laboratory he could not move.

Appellants also challenge the admission of evidence of a high speed car chase involving Dierling and Adair County deputy sheriff Leonard Clark, as well as evidence that Dierling shot Clark and had a variety of weapons on his property. Dierling fled when Clark attempted to stop and arrest him for violation of a protection order. A chase ensued which ended in Dierling's shooting and wounding Clark (Dierling was in turn shot by Clark.).

B.

We review the trial court's evidentiary rulings for abuse of discretion, keeping in mind that its discretion is particularly broad in a conspiracy trial. United States v. Searing, 984 F.2d 960, 965 (8th Cir. 1993). In order to establish the existence of a conspiracy the government must prove that at least two persons entered into an agreement with an objective to violate the law. United States v. Wilson, 103 F.3d 1402, 1406 (8th Cir. 1997). Acts committed in furtherance of a conspiracy are admissible as circumstantial evidence that the agreement existed, Blumenthal v. United States, 88 F.2d 522, 531 (8th Cir. 1937), unless the evidence causes "unfair prejudice, substantially outweighing probative value" under Fed. R. Evid. 403. See United States v. McRae, 593 F.2d 700, 707 (5th Cir. 1979). The critical issue is "the degree of unfairness of the prejudicial evidence and whether it tends to support a decision on an improper basis." United States v. Payne, 119 F.3d 637, 645 (8th Cir.), cert. denied, No. 97-6358, 1997 WL 644822 (U.S. Nov. 17, 1997).

The record indicates that the killing of Danny Craig was admissible evidence of an act committed in furtherance of the conspiracy and therefore relevant and not unfairly prejudicial to the appellants. Craig was actively involved in the conspiracy, and his elimination resulted from his drug debt to Dierling. The slaying was an act by the conspiracy's leaders to control a subordinate member of the conspiracy. See Untied States v. Tramunti, 513 F.2d 1087, 1118 (2d Cir. 1975). The evidence showed the lengths the conspirators would go to protect their interest in the long term viability of the conspiracy. See United States v. Meester, 762 F.2d 867, 874 (11th Cir. 1985). It also demonstrated concerted drug-related action by all conspirators. Holt and Perkins caught and beat Craig and told him Dierling was upset. Dierling and Younger committed the actual killing in Dierling's home, the center of the operation. The evidence was probative of a conspiracy involving all appellants.

Appellants question the sufficiency of the evidence that the killing actually occurred. Craig's body was never found, and the only direct evidence at trial about the killing was the eyewitness testimony of Stephanie Nickell. The evidence and the credibility of the witnesses were for the jury to weigh, however, and Nickell was thoroughly cross-examined.[3] There was also corroboration of her testimony by evidence about Craig's disappearance and the evidence supplied by Michelle Crawford suggesting Perkins and Holt beat Craig as part of Dierling's retaliation against him. Although the slaying evidence was violent and grisly in nature, there was testimony to connect it directly to the drug business of which appellants were accused. Craig took Dierling's drugs and didn't pay him, and brutal consequences followed to enforce the rules of the business. The district court did not abuse its discretion in determining that the probative value of the slaying evidence outweighed any prejudicial effect.

---

[3]Nickell did not approach authorities with the information she possessed, but revealed it in the course of questioning after jailers heard her screaming during nightmares she had in jail. The sheriff testified that after he took her to the jail doctor she mentioned the Craig killing.

Appellants also object to the evidence related to the burning of Dierling's barn and house on the grounds there was no proof Dierling was responsible or that the burnings were linked to the conspiracy. They claim that the fires were related to Dierling's marital problems and pending divorce from his wife who lived on the property. Younger, Perkins, and Holt argue that the evidence was especially prejudicial to them since they could not have foreseen the fire. The evidence linking the fire to Dierling and the methamphetamine operation was sufficient to find that it was an act to protect the conspiracy. The fire followed the visit of law enforcement officers who were thus able to see incriminating evidence. It was not unforeseeable to the coconspirators that Dierling would take steps to eliminate the evidence, and Collis testified that Dierling told him he had set the fire for that purpose. The district court did not abuse its discretion in admitting this evidence.

Appellants claim that Dierling's flight from deputy Clark when he attempted to stop him and the subsequent shooting of Clark were not in furtherance of the conspiracy because Clark intended to arrest Dierling for violating a domestic protection order. Flight from law enforcement officers can be probative of consciousness of guilt and may further a conspiracy. See United States v. Roy, 843 F.2d 305, 310 (8th Cir. 1988). The intended purpose of the attempted stop need not be related to the conspiracy. Id. The real question is what is in the mind of the person who flees and whether there is sufficient evidence to allow the inference that the flight was prompted by consciousness of guilt. Id. There was evidence that Dierling was on a drug-related errand when Clark attempted to stop him and that Dierling was aware that the authorities knew about his drug activities. The jury could have determined that the high-speed flight was intended to protect and maintain the conspiracy, and this was not the only evidence it heard about flight by a conspirator. Dierling had evaded capture by the police on an earlier occasion while on his way to buy methamphetamine production materials. Younger was involved in two high-speed pursuits after he refused to pull over his motorcycle when police attempted to stop him for traffic

violations.[4]  There was also evidence that Dierling made statements indicating his willingness to harm law enforcement officers in order to protect his drug activities.  The evidence of the chase and shooting of Clark was relevant to the conspiracy, and the court minimized any unfair prejudice to other conspirators by instructing the jury that it should consider the shooting only against Dierling.

Younger and Perkins challenge the admission of evidence of a large cache of weapons seized from Dierling's home and argue there was no showing that the guns and knives were related to the conspiracy.  Weapons are key tools in the drug trade and can be evidence of a drug conspiracy.  See United States v. Emmanuel, 112 F.3d 977, 979-80 (8th Cir. 1997).  Weapons played a significant role in this conspiracy.  Police recovered a military-style assault rifle from Dierling's truck, along with cash and methamphetamine, when he was arrested for arson.  Dierling shot deputy Clark with a .357 caliber handgun, and he apparently became associated with Younger after he shot him by accident when aiming at his drug associate.  The weapons were relevant to the conspiracy charge and not unfairly prejudicial in light of all the evidence of the operations of the conspirators.

Finally, Dierling's argument that the evidence about the slaying, fire, and shooting was inadmissible other crimes evidence under Fed. R. Evid. 404(b) is incorrect.  This was evidence tending to show that a conspiracy existed among the appellants and how it operated.  "Direct evidence of participation in a conspiracy is probative of the crime charged and thus does not constitute other crimes evidence within the meaning of rule 404(b)."  United States v. Kinshaw, 71 F.3d 268, 270 (8th Cir. 1995).

---

[4]Younger was returning from a drug deal when the first chase occurred, and the police recovered $2100.00 cash, methamphetamine, and syringes; he was on his way to sell drugs the next time, and knives, a scale, and drugs were found on him.

## III.

### A.

Younger argues that his conviction should be reversed because the trial court refused to provide immunity for his witnesses. Younger attempted to call Shawn Russell and Jess Mahurin who both refused to testify after the court appointed counsel for them and they were advised of their fifth amendment rights. Younger asked the court to grant immunity to the witnesses or require the government to offer it, but the court declined. Younger claims that since the prosecution relied on immunized witnesses to present its case and his witnesses would have offered exculpatory testimony, the court's refusal to offer immunity violated his rights under the compulsory process clause of the sixth amendment. Younger speculates that Russell would have testified that he had seen Danny Craig alive after the alleged killing and that Stephanie Nickell had lied. He also says that Mahurin would have denied ever seeing Craig's severed head or seeing Dierling, Younger, or Nickell on the night of the killing.

Younger had no right to judicially imposed immunity for his witnesses. No power or duty to grant judicial immunity has been recognized in this circuit. United States v. Robaina, 39 F.3d 858, 863 (8th Cir. 1994); United States v. Hardrich, 707 F.2d 992, 994 (8th Cir. 1983). Use immunity has been ordered elsewhere on occasion for a witness with "clearly exculpatory" evidence where there is no strong countervailing interest of the government. Gov't of the Virgin Islands v. Smith, 615 F.2d 964, 972-73 (3d Cir. 1980). There is no reason in this case to examine the policy implications of judicial involvement in use immunity, see, e.g., United States v. Capozzi, 883 F.2d 608, 613-614 (8th Cir. 1989); United States v. Turkish, 623 F.2d 769 (2d Cir. 1980), because Younger has not shown that the proposed testimony was clearly exculpatory. There was enough evidence to convict the appellants of conspiracy without evidence of the killing, and there was no deliberate distortion of the truth-finding process by the government, and no government misconduct or threats to

witnesses. The court did not err in declining to grant judicial immunity to Younger's witnesses.[5]

## B.

Younger objects to exclusion of testimony by his investigator about statements made by Mahurin and Russell in interviews. The testimony was excluded by the trial court on the grounds it was hearsay and the witnesses were not unavailable within the meaning of Fed. R. Evid. 804(b)(3) and 804(b)(5). The government concedes the witnesses were unavailable because of their assertion of the fifth amendment, but it argues the evidence is inadmissible under either exception because both rules require trustworthiness. The trial court did not make a specific reliability determination, but both 804(b)(3) and 804(b)(5) permit the admission of evidence from an unavailable witness only if it has indicia of trustworthiness. The trustworthiness requirement was not satisfied here, and there was therefore no error in exclusion of the testimony. See United States v. Thomas, 919 F.2d 495, 498 (8th Cir. 1991). Moreover, the statements which Younger claims Russell or Mahurin would make would not have subjected them to criminal liability, a requirement under Rule 804(b)(3), United States v. Hazelett, 32 F.3d 1313, 1317-18 (8th Cir. 1994), and Rule 804(b)(5) is applicable only in exceptional circumstances not present here. United States v. Gaines, 969 F.2d 692, 697 (8th Cir. 1992).

## C.

Perkins argues that the court abused its discretion by refusing to allow him to impeach government witness Michelle Crawford by introducing an interview report of a DEA agent. According to this report Crawford told the agent that she saw Perkins

---

[5]Younger additionally sought court-imposed immunity for Paul Smith and Debbie Bramlett, but their testimony was also not clearly exculpatory.

beat Danny Craig, cut him with a large knife, and throw him into a ditch. She also said that Perkins had intimated to her that he had fed Craig's body to some hogs. Counsel for Perkins questioned Crawford at trial about her interview but did not ask her about the hog statement or attempt to introduce the contents of the report against her. Instead, Perkins offered the report during the testimony of the DEA agent in order to impeach Crawford's testimony. The court did not err in refusing to admit the report. Rule 613(b) allows impeachment by prior inconsistent statement only when a witness is first provided an opportunity to explain the statement. See United States v. Sutton, 41 F.3d 1257, 1260 (8th Cir. 1994). Moreover, the statement was not inconsistent with Crawford's testimony, see United States v. Hale, 422 U.S. 171, 176 (1975); United States v. Cody, 114 F.3d 772, 776 (8th Cir. 1997), and the court invited Perkins to offer the statement in his case-in-chief, but he declined.

## IV.

Holt challenges the failure of the trial court to give a special instruction to the jury on how the government witnesses interpreted their immunity agreements. He argues that the witnesses' testimony about immunity differed from the wording of their agreements and that an instruction was therefore necessary. Appellants questioned the witnesses about their agreements at trial, and they were free to argue to the jury about the agreements, how the witnesses interpreted them, and credibility. Instructions 5 through 17 explained to the jury the factors it should consider in evaluating credibility. The immunity agreements, prior convictions, and government payments for assistance were included in the explanation. There was no need to give an additional instruction in these circumstances. See United States v. Ridinger, 805 F.2d 818, 821 (8th Cir. 1986); United States v. Bowman, 798 F.2d 333, 336 (8th Cir. 1986).

## V.

Younger, Holt, and Perkins contend it was reversible error not to sever their cases from that of Dierling because there was evidence admitted at their joint trial concerning his independent criminal activity, causing the jury to find them guilty because of their association with him. Holt adds that he was entitled to a severance because of evidence of acts that were not foreseeable to him or committed in furtherance of the conspiracy and that would not have been admissible if he had been tried alone.

Only an abuse of discretion resulting in definite prejudice requires reversal of a conviction based on denial of a motion to sever. United States v. Delpit, 94 F.3d 1134, 1143 (8th Cir. 1996). A joint trial is appropriate for those charged with conspiracy where proof of the charges is based on common evidence and acts. United States v. Stephenson, 924 F.2d 753, 761 (8th Cir. 1991) (quoting United States v. Jackson, 549 F.2d 517, 523 (8th Cir. 1977)); see also United States v. Kindle, 925 F.2d 272, 277 (8th Cir. 1991). Where there are multiple criminal acts in furtherance of a conspiracy, each defendant need not have participated in every act for a joint trial to be appropriate. Delpit, 94 F.3d at 1143; United States v. Jones, 880 F.2d 55, 62-63 (8th Cir. 1989). It does not matter that there may be varying strength in the evidence against each defendant. Stephenson, 924 F.2d at 761 (quoting Jackson, 549 F.2d at 525). In order to prevail appellants must establish either that a specific trial right was prejudiced or that a joint trial prevented the jury from making "a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539 (1993).

It was appropriate to try appellants together. There was evidence that the challenged acts were committed in furtherance of the conspiracy so they would have been admissible in individual trials. See United States v. Darden, 70 F.3d 1507, 1527 (8th Cir. 1995), cert. denied, 116 S.Ct. 1449 (1996). The other conspirators were also

-15-

closely involved in events described in the challenged evidence. All of them committed some act of violence against Craig related to the drug debt he owed Dierling, and a joint trial is permissible even if all conspirators did not participate in a killing where violence is a modus operandi of a conspiracy and the action was committed in furtherance of the conspiracy. See Delpit, 94 F.3d at 1143. All conspirators were involved in flights from law enforcement except Perkins,[6] and it cannot be said that the chase evidence prevented the jury from making an individual determination of whether a particular defendant participated in the conspiracy. All took part in drug-related activities on Dierling's property, and it would have been foreseeable that Dierling might attempt to prevent detection of evidence there. All carried firearms during the conspiracy, and the court instructed the jury to consider the shooting of deputy Clark only against Dierling and to make individual determinations of guilt or innocence as to each defendant. The evidence was not so complicated that the jury would have been unable to make individual determinations about the guilt or innocence of each defendant. United States v. Willis, 940 F.2d 1136, 1138 (8th Cir. 1991). A joint trial was necessary to give the jurors a perspective on all the evidence. Delpit, 94 F.3d at 1143 (quoting Darden 70 F.3d at 1528). The court did not err in denying the motions to sever.

## VI.

Younger and Perkins argue they are entitled to a new trial because of the government's failure to turn over Brady material. After his conviction Younger moved for a new trial based on newly discovered evidence. He claimed the government should have given him information it had about Judy Dierling, Brian's wife at the time

---

[6]Dierling and Younger led chases more than once in their vehicles, and Holt was a passenger during Dierling's first chase.

of the conspiracy, and about a DEA interview with Danny Collis, the nephew of Bobby Collis.[7] The district court denied the motion after a hearing.

---

[7]Dierling claims to have discovered other new evidence during the pendency of this appeal and moved for a remand for it to be considered by the district court. The other appellants have joined in the motion.

Appellants claim this evidence shows that Craig was killed on a different date from Nickell's account and that there was an additional investigation into the killing. They rely on two search warrant affidavits. One indicates that Craig was reported missing on May 25, 1995, several weeks before his alleged murder on June 9, 1995. The other states that three of Craig's acquaintances were among the last to see him alive, that people were splitting up Craig's things because they thought he was dead, and that the police had received tips to search a certain pond for Craig's remains. This affidavit also reports that one of the individuals said that "Danny Craig wouldn't be coming back, that Super Bee, Brian Dierling had got him." Appellants claim this information should have been disclosed under Brady.

Appellants have not made a sufficient showing to require a remand, and their motion is denied. At the time of trial appellants had a police report stating that Danny Craig had been last seen on May 23, 1995, two days before the Schuyler County affidavit says Craig was reported missing. The government points out that appellants had been aware that there were local investigations into Craig's slaying and showed it during their cross examination of Bobby Collis. The allegedly new evidence also would be of questionable value to the defense.

Dierling has filed several pro se briefs discussing other information that has come to his attention, a self-styled "motion submitting facts," and a request that he be furnished with his own copy of the trial transcript at government expense. It is not our practice to consider pro se briefs filed by parties represented by counsel, Howard v. Caspari, 99 F.3d 895, 898 (8th Cir. 1996), cert. denied, 117 S.Ct. 1831 (1997), and based on our review of his submissions, there is no reason to depart from the practice in this instance, and his counsel has cited the transcript extensively.

The government violates a defendant's right to due process when it fails to disclose to the defense favorable material evidence in its possession. Brady v. Maryland, 373 U.S. 83 (1963). Evidence is material when there is a reasonable probability that the result of the trial would have been different had the government disclosed the information. Kyles v. Whitely, 115 S.Ct. 1555, 1566 (1995). A "reasonable probability" of a different result is shown when nondisclosure "undermines the confidence in the outcome of the trial." Id. (quoting United States v. Bagley, 473 U.S. 667, 678 (1985)).

Appellants rely on an affidavit of Judy Dierling's attorney in which he states that he heard Judy tell a DEA agent over the phone that she had no knowledge of a methamphetamine laboratory on the Dierling property or Craig's having been killed there. They say the government had a duty to disclose this information under Brady, as well as the fact that it had been able to locate Judy and place her under subpoena. They argue that they would then have called Judy to testify and that her testimony would have impeached Stephanie Nickell who had reported that Judy was also in the house the night Craig was killed.

A variety of witnesses at trial testified to the extent and nature of the conspiracy, and evidence provided by law enforcement of drug dealing and seized drugs, money, and weapons was introduced. Appellants also conducted a thorough cross examination of Nickell, questioning her about prior inconsistent statements, lies told to the police, and drug use. Judy Dierling was originally charged in state court with the murder of Danny Craig along with Brian Dierling and Younger, but the charges against her had been dismissed. Her statement to the agent was obviously in her interest since it was exculpatory to her. Considering the nature of Judy's possible testimony, the evidence tending to corroborate Nickell's story, and especially the fact that the government's case against appellants did not depend on Nickell's testimony, it is not reasonably probable that Judy's testimony would have altered the outcome of the trial. The

information was thus not material. Bagley, 473 U.S. at 682; United States v. Risken, 788 F.2d 1361, 1375 (8th Cir. 1986).

Appellants were aware that Judy Dierling had lived on Dierling's property, that she had been initially charged with the murder of Craig, that she had pled not guilty to the charge, and that those charges had been dismissed. The evidence they say the government should have disclosed adds little, if anything, to what they already knew. They did not inform the government they were looking for Judy Dierling or request its assistance in locating her or in securing her testimony. There is no indication that the government sought to hide her or make her unavailable or that it suppressed material information. See United States v. Cheatham, 899 F.2d 747, 753 (8th Cir. 1990); United States v. Ruggiero, 472 F.2d. 599 (2d Cir. 1973). In these circumstances neither Brady nor the compulsory process clause of the sixth amendment were violated.

Appellants also claim they were entitled to statements Danny Collis made to DEA agents during a pretrial interview because their investigator Wesley Burns allegedly discovered that Collis had given exculpatory information. At a hearing on the motion for a new trial, Burns testified that Collis had claimed to him that he had "first hand knowledge" about what happened to Danny Craig and that Younger and Dierling had nothing to do with it. The statements Collis made to Burns do not indicate that he gave this information to the government, however, and the district court did not so find.[8] Mere speculation that the government had exculpatory evidence is an insufficient basis for a Brady claim, United States v. Van Brocklin, 115 F.3d 587, 594 (8th Cir. 1997), and the government has no duty to disclose information it does not have. Reed v. United States, 106 F.3d 231, 235 (8th Cir. 1997).

---

[8]We have reviewed the tape of the interview between Burns and Collis. During the interview Collis responded affirmatively to a series of leading questions from the investigator, but he did not make any statements of his own about the killing and did not say anything about having reported such information to the government.

The district court did not err in denying the motion for a new trial on the ground that favorable material information was not disclosed by the government.

## VII.

All appellants claim that they are entitled to resentencing. They say the court used unreliable testimony to determine that the conspiracy involved 10 to 30 kilograms of methamphetamine. Younger also argues that it was error to include in that amount a container of methamphetamine which he claims was unmarketable. In addition, Dierling challenges the enhancements he received for being a leader of the conspiracy and for obstruction of justice. The amount of drugs must be established by a preponderance of the evidence, United States v. Rose, 8 F.3d 7, 9 (8th Cir. 1993), and we review sentencing findings for clear error. United States v. McMurray, 34 F.3d 1405, 1415 (8th Cir. 1994).

## A.

Appellants object to the court's reliance on testimony by three immunized witnesses who were admitted drug addicts. The sentencing guidelines provide that "[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance." USSG § 2D1.1, comment. (n.12). In such situations it is proper to rely on testimony of witnesses to establish drug amounts. See United States v. Marks, 38 F.3d 1009, 1014 (8th Cir. 1994). The sentencing court's assessment of the credibility of witnesses is nearly unreviewable. United States v. Karam, 37 F.3d 1280, 1286 (8th Cir. 1994). Appellants' expert pharmacologist testified at the sentencing hearing that users can suffer hallucinations which could distort their estimates of drug quantities, and they rely on United States v. Simmons, 964 F.2d 763, 776 (8th Cir. 1992), where the key witness lied under oath and also admitted that her drug use had impaired her memory. The circumstances here are different from Simmons. Two of the government witnesses

admitted that while under the influence of methamphetamine they had experienced paranoia or "paranoia-like hallucinations," but there was no demonstrated untruthfulness and nothing in the record to indicate that they had suffered memory loss or hallucinated about the amount of drugs they saw. Appellants also argue that the witnesses were unreliable because the prices they reported did not always fit the amounts of methamphetamine. One witness reported that Holt and Perkins bought five pound quantities of methamphetamine from Dierling and Younger for $5,000, but trial testimony established that five pounds had a street value of $160,000. There was testimony, however, that appellants had gone to Dierling's farm on several occasions to deliver money for previously received drugs. The court could have found that partial payments were made or that Holt and Perkins paid reduced rates because of their position in the conspiracy. It was up to the court to evaluate the testimony, and its findings were not clearly erroneous.

B.

Younger argues that the court erred by partially basing his sentence on 300 grams of a substance containing methamphetamine that was found in a jar seized during a stop of his vehicle and on other seized substances containing methamphetamine. Younger contends that these substances were only 0.5% methamphetamine and were therefore undistributable or unmarketable under United States v. Jennings, 945 F.2d 129 (6th Cir. 1991), amended on other grounds, 966 F.2d 184 (6th Cir. 1992), cert. denied, 117 S.Ct. 411 (1996), and United States v. Jackson, 115 F.3d 843 (11th Cir. 1997). The methamphetamine in Jennings likely contained uningestible, poisonous byproducts, and Jackson held that only "usable" or "marketable" amounts of controlled substances should be counted for sentencing. 115 F.3d at 846-48. Appellants have not presented evidence that the contents of the jar[9] or any of the methamphetamine

---

[9]Although Younger argued at his sentencing hearing that the jar contained waste water left over from the manufacture of methamphetamine, he does not make that argument on appeal. Subsequent to Jennings, the United States Sentencing

introduced at trial was tainted or unmarketable, however.[10]  The guidelines specify that the "weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." USSG § 2D1.1 (c). (n.*) (Drug Quantity Table).  Since 0.5% is a detectable amount, the guidelines require that the drug calculations include the methamphetamine Younger challenges.  See United States v. Smith, 49 F.3d 362, 367 (8th Cir.) (plain meaning of the guidelines is controlling), cert. denied, 514 U.S. 1131 (1995).

Dierling argues in addition that the court erred in including in its count amounts that could have been manufactured from a recipe that he gave to Bobby Collis while they were in jail.  Dierling contends the recipe would not have yielded methamphetamine, but the government presented evidence to the contrary and it was for the trial court to resolve any conflict.  See, e.g., United States v. Carter, 997 F.2d 459, 460-61 (8th Cir. 1993).

C.

Dierling also challenges his sentence enhancements: four levels because he was a leader or organizer of an enterprise involving five or more participants, USSG § 3B1.1, and another four levels for obstruction of justice for burning his property and for his flight from law enforcement.  USSG § 3C1.1.  The trial court examines all relevant conduct in the case to determine an individual's role in the charged offense,

---

Commission amended the commentary to the guidelines to specify that "waste water from an illicit laboratory used to manufacture a controlled substance" does not count towards sentencing.  USSG § 2D1.1, comment. (n.1).

[10]It is therefore not necessary to consider whether the marketability test should apply in this circuit.

Untied States v. Flores, 959 F.2d 83, 86 (8th Cir. 1992), and its findings are reviewed under the clearly erroneous standard. United States v. Skorniak, 59 F.3d 750, 757 (8th Cir.), cert. denied, 116 S.Ct. 487 (1995).

There was ample evidence to show that Dierling was a leader and organizer of a methamphetamine manufacturing and distribution conspiracy involving five or more people. USSG § 3B1.1(a). Dierling's participation in the conspiracy conforms in many respects to the types of activity described in the commentary to the relevant guideline section. USSG § 3B1.1, comment. (n.4). Dierling exercised decision making authority for the conspiracy as a director of the distribution scheme. See United States v. Fuller, 942 F.2d 454, 458 (8th Cir. 1991). Evidence showed that it was Dierling's idea to kill Danny Craig, that he put out a contract on his life, and that he induced others to beat Craig. Witnesses testified that Holt, Perkins, and Craig were dealing drugs under Dierling's direction. Dierling also gave a firearm to Michelle Crawford while she was transacting business on behalf of the conspiracy because he believed it was necessary for her protection. Dierling recruited members of the conspiracy and supervised the procurement of drug manufacturing materials. He offered to teach Candy True how to produce methamphetamine. He also solicited the assistance of Danny Craig to pick up drug manufacturing materials from his barn. Dierling brought others together to manufacture the drug and set up a manufacturing laboratory on his property. See United States v. Keene, 915 F.2d 1164, 1170 (8th Cir. 1990). He attempted to enlist Bobby Collis in the manufacture of methamphetamine in order to raise money to get out of jail. He called Candy True from jail and asked her to procure materials because he planned to make the drug to raise money upon his release. See United States v. Wagner, 884 F.2d 1090, 1098 (8th Cir. 1989). There is no question that he was a leader or organizer.

There was also sufficient evidence on which the court could find that Dierling "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice" when he burned his house and barn and fled from police on two occasions.

-23-

USSG § 3C1.1. Enhancement is appropriate where "misconduct occurs with knowledge of an investigation, or at least with a correct belief that an investigation is probably underway." United States v. Oppedahl, 998 F.2d 584, 586 (8th Cir. 1993). There was evidence that Dierling set fire to his property at a time he knew he was the target of an investigation into the production and distribution of methamphetamine. He knew that the police had searched his property only days before the fire. Dierling told government witness Michelle Crawford around the time of the fire that they had to go to Iowa to get methamphetamine because "things were hot around there" which she understood to mean "the cops were on him." Dierling also told Bobby Collis while the two were in jail that he set fire to his property to destroy the remnants of a methamphetamine laboratory. There was enough evidence to show that Dierling "consciously act[ed] with the purpose of obstructing justice." United States v. Watts, 940 F.2d 332, 332-33 (8th Cir. 1991) (quoting United States v. Stroud, 893 F.2d 504, 507 (2d Cir. 1990).

Dierling argues that the court improperly assessed a two level enhancement because of his flight and shooting of deputy Clark. He says that Clark was attempting to arrest him on warrants for the violation of a protective order and so his flight should not be attributed to any awareness of an investigation of his drug activities. There was evidence, however, that he knew he was suspected of drug dealing and that he intended to evade capture and protect the illegal operation. This was sufficient to support the district court's obstruction ruling.

D.

In summary, the trial court made detailed findings at the sentencing hearing as to the credibility of the witnesses, addressed thoroughly and individually the objections of each appellant to the Presentence Report, and otherwise fully complied with the relevant requirements of Fed R. Crim. P. 32. There was evidence to support the findings, and there is no reason to overturn them or to require resentencing.

VIII.

Appellants were involved in a large methamphetamine conspiracy, and the conspirators acted ruthlessly at times to protect its operation. There was a wealth of evidence to support the jury verdicts and the sentencing findings. Appellants have not shown reversible error at their joint trial or that they are entitled to a new trial, and for the reasons already discussed we affirm the judgments.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.