# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-3130SD

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | On Appeal from the United |
| v. | * | States District Court |
| | * | for the District of |
| Jose Jesus Madrigal, also known | * | South Dakota. |
| as Fat Boy, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: May 11, 1998

Filed: August 5, 1998

_____

Before RICHARD S. ARNOLD, JOHN R. GIBSON, and FAGG, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.

After a jury trial, Jose Jesus Madrigal was convicted of conspiracy to possess and distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1994), promoting and facilitating an unlawful business activity involving controlled substances, in violation of 18 U.S.C. §§ 1952 and 2 (1994), and using a communication device to cause and facilitate possession with intent to distribute, in violation of 21 U.S.C. § 843 (b) (1994).  On appeal, Madrigal raises several evidentiary issues and asserts that the District Court erred in denying his motion for a new trial.  We affirm.

I.

The following is a summary of the facts essential to an understanding of Madrigal's arguments on appeal. The indictment against Madrigal and six others resulted from an investigation, jointly conducted by state, federal, and local law enforcement officers, into illegal narcotics transactions between individuals in Los Angeles, California and Sioux Falls, South Dakota. The investigation began after the arrest of codefendant Jason Nordman in 1994 for possession of methamphetamine. Authorities in South Dakota determined that Nordman was involved in the distribution of controlled substances and that he possibly had a California source. The source was determined to be codefendant Daniel Navarette, who had moved from Sioux Falls to Los Angeles in the summer of 1994. Before leaving, Navarette and Nordman had devised a plan whereby Navarette would purchase drugs in Los Angeles and send them to Nordman for distribution in Sioux Falls.

Navarette testified that in September 1994 he was introduced to appellant Madrigal and codefendant Osvaldo Olivares (also referred to as "Valo") in Los Angeles, and that the two sold him cocaine and methamphetamine. Trial Transcript 166-73. Navarette then mailed the drugs to Jason Nordman in South Dakota. Nordman distributed the drugs and then, through Western Union, wired Navarette his part of the profits and money for more drug purchases. Documentation from Western Union and United Parcel Service introduced at trial corroborated Navarette's testimony that he and the codefendants conducted drug transactions using this system. In December 1994, Madrigal and Olivares began making trips to South Dakota to deliver the drugs directly to Jason Nordman.

In early January 1995, Navarette moved back to Sioux Falls and a few weeks later he, Jason Nordman, and several others were arrested in a hotel room. Madrigal and Olivares were in Sioux Falls at the time, but were not present in the hotel room when the arrests were made. Navarette did not post bond after the January arrest,

although Nordman did and resumed buying drugs from Madrigal. Navarette testified that while in jail he continued communicating with Nordman by phone, in person, and through letters, and that he learned Nordman was still involved in drug trafficking and distribution with Madrigal. From February until Nordman's arrest in October, Madrigal and Nordman continued transacting drug deals, with Madrigal regularly traveling to South Dakota to make deliveries.

At trial, Nordman testified about numerous drug transactions with Madrigal and Olivares, and described some that involved the remaining codefendants, including Nordman's wife, Kim Nordman, his sister, Charlotte Nordman, and his sister-in-law, Deborah Krier. Nordman was arrested in October when he was caught with a package of drugs Krier had obtained in Los Angeles. Madrigal testified at trial that he knew all of the codefendants, although he denied delivering drugs to any of them. He said he had made the visit to South Dakota with Olivares in December at Olivares's invitation, and that, over time, he began making the trips himself, picking up envelopes of money from Jason Nordman in return for $500 paid to him by Olivares.

In December 1995, a 54-count superseding indictment was filed in the United States District Court for the District of South Dakota charging Madrigal and seven codefendants with conspiracy to possess with intent to distribute controlled substances, 21 U.S.C. §§ 841(a)(1) and 846 (1994); possession with intent to distribute controlled substances, 21 U.S.C. § 841 (a)(1) (1994); interstate travel in aid of racketeering, 18 U.S.C. §§ 1952 and 2 (1994); and use of a communication device to commit felonies under the Controlled Substances Act, 21 U.S.C. § 843(b) (1994). Madrigal was arrested in Los Angeles and transferred to the District of South Dakota. Six of Madrigal's codefendants pleaded guilty before his trial, and one, Olivares, was a fugitive at the time of trial. After a jury trial, Madrigal was convicted of the conspiracy count, seven counts of interstate travel in aid of racketeering, and one count of use of a communication device to commit a felony under the Controlled Substances Act.

Madrigal was acquitted on the other counts. The District Court[1] denied Madrigal's motion for a new trial and sentenced him to 84 months in prison, ordered payment of a $5,000 fine, and imposed 5 years of supervised release. Madrigal asserts that the District Court erred with respect to a variety of evidentiary rulings and appeals from the denial of the motion for a new trial.

## II.

On appeal, Madrigal asserts the District Court erred in admitting Kim Nordman's statements that Madrigal had threatened to "have [Jason Nordman] and his whole family taken out" if Jason did not "make up for the drugs and profit that was [sic] lost" because of Nordman and Navarette's arrest and the resulting seizure of drugs supplied to them by Madrigal. Trial Transcript 331. Madrigal characterizes the statements as inadmissible evidence of other acts under Federal Rule of Evidence 404(b). He argues that when examined for its probative value and its prejudicial effect as required by Rule 403, evidence of the alleged threat was unfairly prejudicial.

Madrigal contends that this Court's decision in United States v. Weir, 575 F.2d 668 (8th Cir. 1978), is controlling. In Weir, the defendant was on trial for bank robbery. At trial, a codefendant testified about incidents in which the defendant threatened to kill several individuals, including the witness himself, an FBI agent, and another man whom the defendant suspected of being an informant. The witness also described how the defendant attempted to kill the suspected informant. The District Court admitted this testimony as other-acts evidence under Rule 404(b) but expressed concern as to the correctness of the ruling because of its highly prejudicial nature. We reversed the District Court, stating,

---

[1]The Hon. Lawrence L. Piersol, United States District Judge for the District of South Dakota.

[i]n agreeing with the district court's original assessment that the prejudicial impact of the "other crimes" evidence substantially outweighed its probative value, we note the obvious tendency of the testimony of [the witness] to suggest to the jury that a decision be rendered on an improper basis. The testimony suggested that appellants be convicted of bank robbery because they were bad men who had threatened to kill law enforcement agents or informers.

Id. at 671 (footnote omitted).

"Acts committed in furtherance of a conspiracy are admissible as circumstantial evidence that the agreement existed . . .." United States v. Dierling, 131 F.3d 722, 730 (8th Cir. 1997) (citing Blumenthal v. United States, 88 F.2d 522, 531 (8th Cir. 1932)), cert. denied, 118 S. Ct. 1401 (1998). Madrigal was on trial for, among other things, conspiracy. Unlike in Weir, where the "other acts" described to the jury bore an attenuated relationship to the charge of bank robbery, Kim Nordman's testimony bears directly on whether a drug conspiracy existed. The threat Madrigal made to Kim Nordman is evidence of an agreement between Madrigal, Jason Nordman, and Daniel Navarette that Madrigal would supply drugs and Nordman and Navarette would distribute them. Madrigal threatened to "take out" the Nordmans presumably because Jason Nordman and Navarette had breached their end of the deal in failing to pay Madrigal for the drugs he agreed to supply them. According to Kim Nordman, Madrigal threatened Jason because "someone has to be responsible for it beings [sic] Danny was in jail." Trial Transcript 331. See Dierling, 131 F.3d at 731 (evidence held admissible because it "showed the lengths the conspirators would go to protect their interest in the long term viability of the conspiracy") (citing United States v. Meester, 762 F.2d 867, 874 (11th Cir. 1985)). The District Court did not abuse its discretion in concluding that the probative value of this evidence outweighed its unfairly prejudicial effect.

III.

Madrigal argues that the District Court erred in allowing Navarette to testify at trial about incriminating telephone, in-person, and written communications between Navarette and Jason Nordman. Madrigal contends these statements were inadmissible hearsay. Navarette was in jail when these contacts occurred, but Nordman had made bail. On direct examination by the government, Navarette testified that Nordman told him he was going to go to California "to purchase some drugs from Jose [Madrigal] and 'Valo' " and that when Nordman returned he told Navarette he had purchased "a key for the front door and a key for the back door" from Madrigal and Valo. Appellant's Brief 30. Navarette explained these metaphors to mean "a kilo of methamphetamine and one of cocaine." Id.

The government argues that under Rule 801(d)(2)(E) Navarette's testimony was admissible nonhearsay because it amounts to "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." To avail itself of 801(d)(2)(E) in introducing Navarette's testimony, the government must prove by a preponderance of the evidence that a conspiracy existed, that the defendant and the declarant were members of the conspiracy, and that the statement was in furtherance of the conspiracy. United States v. Lewis, 759 F.2d 1316, 1342 (8th Cir.), cert. denied, 474 U.S. 994 (1985). Madrigal asserts that Navarette was in jail when the conversations took place with Nordman and that once in jail, Navarette renounced any further participation in the conspiracy. Madrigal reasons that the conspiracy was thereby terminated, and that 801(d)(2)(E) cannot be utilized to admit Navarette's testimony.

We may reverse the District Court on this issue only if its findings were clearly erroneous. See United States v. Alonzo, 991 F.2d 1422, 1425 (8th Cir. 1993). There is ample evidence that, at the time of the conversations between Nordman and Navarette, a conspiracy existed, that Madrigal and Nordman were members of it, and that the statement at issue was made during the course of and in furtherance of the

conspiracy. Contrary to Madrigal's assertion, Navarette's incarceration did not terminate the conspiracy. See United States v. Williams, 87 F.3d 249, 253 (8th Cir. 1996) ("The arrest of one coconspirator does not necessarily terminate the conspiracy."), petition for cert. filed (U.S. Jan. 19, 1998) (No. 97-9413). Nordman pleaded guilty to conspiracy and testified about several drug transactions with Madrigal that directly correspond with Navarette's trial testimony.

Navarette's contention that the only reason he continued discussing Nordman's illegal activities with him was out of "curiosity," is not conclusive of the question of whether Nordman and Madrigal were acting in furtherance of the conspiracy at the time Nordman made the statement to Navarette. Appellant's Brief 28. We have long held that "[s]tatements of a coconspirator identifying a fellow coconspirator as his source of controlled substances is [sic] in furtherance of the conspiracy and therefore admissible." United States v. Womochil, 778 F.2d 1311, 1314 (8th Cir. 1985). Nordman's statement about buying drugs from Madrigal was made in furtherance of the conspiracy. The District Court did not err in admitting Navarette's testimony.

IV.


Madrigal states that "[t]he government refused to disclose any witness statements taken by the [Assistant United States Attorney]" and that "[the government's] insistence not to furnish his notes even for in camera review were [sic] suspicious and troubling." Appellant's Brief 40-41. Madrigal also asserts "[t]he Court was repeatedly requested to make an in camera review of the [Assistant United States Attorney's] notes and memos of interview to assess the Brady, . . . and Jencks in them" but did not grant those requests. Id. at 41. Madrigal does not identify in his brief the witnesses whose statements he contends were not divulged. At the hearing on the motion for a new trial, however, Madrigal argued that the Assistant United States Attorney failed to provide complete notes from his pre-trial interview with Kim Nordman. Hearing on Post-Trial Motions 4-13. We assume these are the notes to which Madrigal is referring. Madrigal also contends that because the government

refused to produce the notes, the District Court erred in not granting his request to review the notes <u>in camera</u>.

Madrigal relies on the Seventh Circuit's holding in <u>United States v. Marshall</u> that "[u]pon reasonable argument from counsel, there is a presumption that the court should conduct an <u>in camera</u> inspection of documents to determine whether the documents are producible under the Jencks Act." 985 F.2d 901, 907-08 (7th Cir.), <u>cert. denied</u>, 508 U.S. 952 (1993). The Jencks Act requires the production of any statements made by a government witness upon motion of the defendant after the witness has testified on direct examination for the prosecution. See 18 U.S.C. § 3500 (1994). The Act defines those statements to which it applies as, in pertinent part:

> (1) a written statement made by said witness and signed or otherwise adopted by or approved by him [or] (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement . . ..

18 U.S.C. § 3500(e)(1)-(2) (1994).

In <u>United States v. Willis</u>, this Court held that a defendant "failed to raise a colorable claim" that FBI routine investigation reports concerning conversations that agents held with a government witness were " 'statements' within the meaning of Jencks." 997 F.2d 407, 413 (8th Cir. 1993), <u>cert. denied</u>, 510 U.S. 1050 (1994). In <u>Willis</u>, our decision turned at least in part on the defendant's failure to offer a reason why the government's assertion that the notes contained no Jencks material should not be believed. Drawing from <u>Willis</u>, we held in <u>United States v. Malone</u> that the government's failure to turn over a Secret Service Agent's notes from an interview with a government witness was not a violation of Federal Rule of Criminal Procedure 16 because the agent's notes "constitute the agent's impression of his interview with [the

witness], not a statement by [the witness]." 49 F.3d 393, 396 (8th Cir.), cert. denied, 516 U.S. 877 (1995).

In light of Willis and Malone, Madrigal has failed to demonstrate why an in camera review of the notes in question was necessary. He provides no basis for his belief that the notes contain "statements" as defined in the Jencks Act.

Madrigal also asserts that the notes should have been reviewed in camera for possible Brady material. Under Brady, the government's suppression of material, exculpatory evidence violates due process. Brady v. Maryland, 373 U.S. 83 (1963). To establish a Brady violation, a defendant must show that 1) the prosecution failed to disclose evidence; 2) the evidence was favorable to the defendant; and 3) the evidence was material. United States v. Van Brocklin, 115 F. 3d 587, 594 (8th Cir. 1997), cert. denied, 118 S. Ct. 1804 (1998). "Evidence is 'material' for Brady purposes if its cumulative effect would be to undermine confidence in the verdict." Id. (citing Kyles v. Whitley, 514 U.S. 419, 434 (1995)). Impeachment evidence may also be subject to Brady. United States v. Bagley, 473 U.S. 667, 676 (1985).

Madrigal asserted at the hearing on the motion for a new trial that the notes from Nordman's interview may have contained information with impeachment value. Madrigal contends that because Kim Nordman's testimony at trial differed from her pre-trial interview regarding the circumstances under which Madrigal threatened to "take out" Jason Nordman, the District Court should have reviewed the interview notes for additional Brady material. We disagree. First, after Kim Nordman testified at trial, she wrote the prosecuting Assistant United States Attorney, explaining why she had changed some of her testimony since the interview. Understanding its potential impeachment value, the government provided the defense with that document, and with the relevant portion of Kim Nordman's pre-trial interview. Responding to this argument in its order denying the motion for a new trial, the District Court stated, and we agree, that "[t]he prosecutor in this case recognized his obligation . . . under Brady,

and fulfilled that obligation by providing the defense with a portion of the notes taken during co-defendant Kim Nordman's interview with the prosecutor." Addendum to Appellee's Brief 2. The District Court's ruling is affirmed.

We have addressed the more substantial of Madrigal's claims that the government failed to provide the defendant with full discovery, and reject the others without further discussion.[2]

V.

The judgment of the District Court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[2]Similarly, we have carefully reviewed Madrigal's other arguments that the District Court erred in evidentiary rulings with regard to: the government's rebuttal closing argument; the government's examination of witnesses at trial; the exclusion from evidence of documents concerning forfeiture of currency seized from Madrigal; and the denial of a request that the government advise Madrigal of the order in which its witnesses would testify at trial. We consider these arguments to be without merit.